## <u>AFFIDAVIT OF TASK FORCE OFFICER KEVIN BARBOSA</u>

I, Kevin Barbosa, a Task Force Officer with the Drug Enforcement Administration, being duly sworn, depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.      I am a "federal law enforcement officer" within the meaning of Federal Rule of Criminal Procedure 41(a)(2)(C), that is, a government agent engaged in enforcing the criminal laws and duly authorized by the Attorney General to request a search warrant. I am also authorized in accordance with Federal Rule of Criminal Procedure 4(c)(2) to execute an arrest warrant. I am a New Bedford, Massachusetts Police Officer and have been assigned as a Task Force Officer ("TFO") with the Drug Enforcement Administration ("DEA") since February 2021. I have been employed as a New Bedford Police Officer for nine years. Prior to joining the DEA, I was a member of the New Bedford Police Organized Crime Intelligence Bureau for more than six years. I have conducted numerous investigations involving controlled substances that have resulted in convictions for violations of controlled substances laws.

2.      I have participated in two federal wiretap investigations (including one active wiretap investigation as described below) and two state wiretap investigations in the Commonwealth of Massachusetts, including assisting in surveillance and monitoring intercepted calls. I have written and/or participated in the execution of numerous search warrants resulting in the seizure of: (a) large quantities of controlled substances and paraphernalia associated with the manufacturing and distribution of controlled substances; (b) United States currency believed to be proceeds of narcotics trafficking; and (c) records of narcotics and monetary transactions, including drug customer lists and drug ledgers. In addition, I have participated in the debriefing of numerous defendants, informants and witnesses who had personal knowledge regarding large-

scale narcotics trafficking organizations.  In addition to search warrants, I have also conducted surveillance and undercover operations and executed arrests on numerous occasions.

3.      I have received extensive training regarding the investigation of controlled substances offenses.  In August 2021, I completed a week-long course in narcotics investigations at the DEA Academy in Quantico, Virginia.  In addition, I participated in a 21-week training by the Massachusetts State Police Municipal Academy.  I have also attended training courses on search and seizure, advanced tactics for patrol, a 20-hour course in preparing for trial, an 8-hour South Coast Anti-Crime Task Force Drug Enforcement Seminar, and an 8-hour course on field testing drugs, as well as various other formal and informal trainings.  As a result of my training and experience, I am familiar with various types of controlled substances, associated paraphernalia, prices for various controlled substances and the common terminology and code words used to refer to these substances.

4.      Based on my training and experience, I am familiar with the methods of operation employed by narcotics traffickers operating at the local, statewide, national and international levels, including those involving the distribution, storage, and transportation of narcotics and the collection and laundering of money that constitutes the proceeds of narcotics trafficking activities.  I am aware that drug traffickers commonly use cellular telephones in furtherance of their drug trafficking activities and frequently change cellular telephone numbers and cellular telephones in an effort to thwart law enforcement's use of electronic surveillance.

5.      I am also aware that drug traffickers often speak in vague, guarded, or coded language when discussing their illegal business in an effort to further prevent detection, and often use text messages in lieu of phone calls to avoid speaking over the telephone.  I am familiar

with the common appearance, packaging, texture, and smell of various narcotics, including fentanyl, heroin, cocaine and cocaine base.

6.      I have participated in the below-described investigation since February 2021.  I am familiar with the facts and circumstances of this investigation from oral and written reports made to me by other members of the DEA, and other federal, state, and local law enforcement agencies.  I make this affidavit based upon personal knowledge derived from participation in this investigation and upon information (whether received directly or indirectly) that I believe to be reliable from numerous sources including, but not limited to, the following:

(a) My training and experience investigating drug-trafficking;

(b) Oral reports, written reports, and documents that I have received from other federal, state, and local law enforcement agents;

(c) Physical and electronic surveillance conducted by me and other federal, state, and local law enforcement officers;

(d) Confidential sources of information;

(e) Public and business records;

(f) Telephone toll records, pen register and trap and trace information, and telephone subscriber information;

(g) GPS tracking device data;

(h) Drug seizures;

(i) Trash pulls;

(j) Queries of law enforcement records and intelligence databases; and

(k) Evidence obtained from judicially-authorized intercepted communications over

Target Telephones (as described below).

## **PURPOSE OF AFFIDAVIT**

7.     This affidavit is being submitted in support of a criminal complaint against the

following individuals (collectively, the "Target Subjects"):

      (1)     Estarlin Ortiz-ALCANTARA, a/k/a Fernande Luis Rivera ("ALCANTARA");

      (2)     Yeury Garcia-RODRIGUEZ, a/k/a Benjamin Osorio-Pizarro ("RODRIGUEZ");

      (3)     Mario Rafael Dominguez-ORTIZ ("ORTIZ");

      (4)     Edwin COLLAZO ("COLLAZO");

      (5)     Rebecca BARTHOLOMEW ("BARTHOLOMEW");

      (6)     Michael PACHECO ("PACHECO");

      (7)     Jose SANTIAGO, a/k/a Cheo ("SANTIAGO");

      (8)     Jason CRUZ ("CRUZ"); and

      (9)     FNU LNU 1,

charging that beginning at least in or about March 2022 and continuing until present, did

knowingly and intentionally combine, conspire, confederate, and agree with each other and

others known and unknown, to possess with intent to distribute and to distribute controlled

substances in violation of 21 U.S.C. § 846 (the "Target Offense").

8.     This affidavit is also being submitted in support of applications for search

warrants for the following target locations, which are described in greater detail below and in

attachments to the relevant warrant applications and warrants:

    a.  602 Eastern Avenue, Apartment # 1, Fall River, Massachusetts (also referred to as "Target Location # 1");

    b.  163 Chestnut Street, New Bedford, Massachusetts (also referred to as "Target Location # 2");

    c.  56 Washburn Street, Apartment 1, New Bedford, Massachusetts (also referred to as "Target Location # 3");

    d.  3 Granite Street, Apartment # 1, Taunton, Massachusetts (also referred to as "Target Location # 4"); and

    e.  113 Reynolds Street, Apartment # 1, New Bedford, Massachusetts (also referred to as "Target Location # 5").

## **Summary of Evidence**

### *A.*  *Background of the Investigation*

9.    In March 2021, the DEA began investigating a drug trafficking operation ("DTO") run by ALCANTARA in Southeastern Massachusetts and Rhode Island (the "ALCANTARA DTO"). Agents[1] first learned from interviewing a cooperating source ("CS-1")[2]

---

[1] The word "agents" as used in this affidavit should be understood to refer to special agents, task force officers and police officers.

[2] CS-1 began cooperating with the DEA in early 2021 for consideration on pending drug charges. According to CS-1's Massachusetts Criminal Record, CS-1 has been convicted of possession of class B controlled substances, disorderly conduct, resisting arrest, possession with intent to distribute class B controlled substances, violation of an abuse prevention order, and assault and battery on a family/household member. CS-1's criminal record also includes numerous defaults and violations of probation. CS-1 explained that CS-1 previously distributed fentanyl and also previously used controlled substances, including opioids. CS-1's information has been corroborated to the extent possible through T-III interceptions, telephone toll analysis, physical and electronic surveillance, and review of prior police

that ALCANTARA distributes multi-kilogram quantities of fentanyl in the New Bedford, Massachusetts area.  CS-1 reported that s/he had previously purchased fentanyl from the ALCANTARA DTO that was delivered by a courier working for ALCANTARA.  CS-1 identified ALCANTARA from a photo array.

10.    Subsequently, CS-1 agreed to engage in ten controlled buys of fentanyl from the ALCANTARA DTO under the direction and supervision of DEA.  During the course of these buys, ALCANTARA dispatched either RODRIGUEZ, ORTIZ or FNU LNU 1 to deliver the fentanyl to CS-1.[3]  Agents provided officially advanced funds ("OAF") to CS-1, which CS-1 provided to the courier.  CS-1 then returned with various amounts of substances that in all cases field-tested positive for the presence of fentanyl.  In addition, agents requested lab testing for all of these substances.  For those substances for which results are available, all of them were positive for the presence of fentanyl.  Several of these buys underly the charges in this case and are explained in depth below.

_____

and criminal records.  I believe CS-1 to be reliable.   Although as explained below, CS-1 has participated in consensually audio and video-recorded controlled buys in this case, CS-1 has told agents that CS-1 does not wish to testify because of concern for CS-1's safety.

    [3] For each of the controlled buys in this case, unless noted otherwise, the following protocols were followed: (a) calls by CS-1 to set up the buys were consensually recorded and/or monitored; (b) text messages sent by CS-1 have been preserved; (c) agents observed CS-1 dial the phone number to set up the buys to confirm that CS-1 was in fact calling the correct phone; (d) CS-1 confirmed that ALCANTARA was the user on the other end of the phone call based on CS-1's familiarity with ALCANTARA's voice having known ALCANTARA for a long period of time; (e) CS-1 was searched before and after each buy for money or contraband, with negative results each time; (f) for each controlled buy, agents maintained surveillance of CS-1 to the meet location, during the meet and immediately afterwards; and (g) all buys were recorded (audio/video or audio-only).

11.     Agents have intercepted three phones belonging to ALCANTARA: Target Telephone 1, Target Telephone 2 and Target Telephone 3.  The investigation has showed that ALCANTARA used Target Telephones 1 and 2 to call and text with his drug customers.  Given my training and experience, and knowledge of the investigation, and based on my understanding of the quantities of fentanyl that these Target Subjects have purchased from ALCANTARA, I believe that the customers/Target Subjects then re-distribute fentanyl to their own customer bases.   The customers of the DTO include BARTHOLOMEW, COLLAZO, CRUZ, PACHECO and SANTIAGO.

12.     As explained in more detail below, the wiretap investigation and surveillance has showed that BARTHOLOMEW is a Cape Cod-based fentanyl distributor.  On April 11, 2022, law enforcement officers stopped a car driven by BARTHOLOMEW and Heather DiGerolomo in Yarmouth, Massachusetts.  BARTHOLOMEW had approximately 90 grams of fentanyl in her bra and DiGerolomo had approximately 80 grams of fentanyl in her bra.  Based on information from local police officers, agents believe that BARTHOLOMEW and DiGerolomo live together in a residence on Cape Cod.  Agents have seen BARTHOLOMEW meeting with ALCANTARA's couriers on numerous occasions in public places like inside the diaper aisle of the Wal-Mart in Fall River, Massachusetts and inside the parking lot of the Price Rite Supermarket, also in Fall River, Massachusetts.

13.     The wiretap investigation and surveillance have showed that COLLAZO, CRUZ and SANTIAGO are New Bedford-based customers of the ALCANTARA DTO.   Surveillance officers have seen ALCANTARA's courier visit CRUZ, COLLAZO and SANTIAGO's residences for brief visits.  Intercepted calls and text messages around the same time as these

visits show that the courier visited to deliver drugs and on certain occasions, to retrieve drug proceeds from COLLAZO, CRUZ and SANTIAGO.  COLLAZO resides at 163 Chestnut Street, a residence in New Bedford, Massachusetts.  CRUZ resides at 56 Washburn Street, Apartment # 1, in New Bedford.  SANTIAGO resides at 113 Reynolds Street, Apartment # 1, in New Bedford.

14.     Furthermore, surveillance and intercepted calls have shown that PACHECO is a fentanyl dealer based out of Taunton, Massachusetts, and based on surveillance, and police reports, I believe he resides at 3 Granite Street, Apartment # 1, in Taunton, Massachusetts.

15.     ALCANTARA used Target Telephone 3 to speak with co-conspirators who worked for his organization, including Joseph Robles, who has rented numerous cars for ALCANTARA that have been used for drug deals involved in this investigation.  These cars include, as described more fully below, a Toyota Corolla used in a deal with PACHECO on April 16, 2022, and a Nissan Versa used in deals on May 23, 2022 and May 27, 2022. ALCANTARA also spoke with Candida DeJesus over the encrypted mobile application Whats App using Target Telephone 3.  DeJesus has driven ALCANTARA's courier using various cars during many of the drug deals described herein, including the deal on June 1, 2022, involving BARTHOLOMEW.

**B.   _Title III Electronic Surveillance_**

16.     On March 14, 2022, the Honorable Indira Talwani, United States District Judge, District of Massachusetts, signed an Order authorizing interception of wire and electronic communications over 781-975-3683 used by ALCANTARA ("Target Telephone 1") (the "March 14 Order").  On March 15, 2022, interceptions began and they terminated on or about

March 18, 2022, after it was learned on March 17, 2022 that ALCANTARA was no longer using Target Telephone 1.

17.     On March 30, 2022, Judge Talwani signed an Order authorizing interception of wire and electronic communications over 774-232-5030 used by ALCANTARA ("Target Telephone 2") (the "March 30 Order").  Interceptions over Target Telephone 2 began on or about March 30, 2022, and terminated on or about April 28, 2022.

18.     On May 19, 2022,  Judge Talwani signed an Order authorizing the renewed interception of wire and electronic communications over Target Telephone 2 and the initial interception of wire communications over 413-275-0448 ("Target Telephone 3") used by ALCANTARA (the "May 19 Order").  Interceptions over Target Telephone 2 and Target Telephone 3 began on or about May 20, 2022, and terminated on or about June 19, 2022.

19.     Throughout the course of this investigation, your Honor has signed numerous warrants authorizing the government to obtain precise location information about Target Telephones, and other phones used by the Target Subjects, and to install GPS devices on vehicles used by the Target Subjects.

## **Probable Cause**

20.     This section details the various roles of the Target Subjects in the charged conspiracy.  It is divided into three parts:  Part I focuses on drug seizures in this case, including both controlled buys and the seizure from BARTHOLOMEW and DiGerolomo on April 11, 2022; Part II focuses on the scope of the Target Subjects' drug trafficking activities and their relationships among each other; and Part III focuses on the Target Locations and links to criminal activity at those locations.

21.     The Target Subjects have been intercepted using coded language to discuss the purchase and sale of fentanyl.   During interceptions, the Target Subjects have not explicitly used terms like "fentanyl," "drugs" or "narcotics."   I know from my training and experience and conversations with other law enforcement officers that drug dealers will speak in vague and coded language to conceal their criminal activity.   In addition, I describe numerous intercepted calls and identify participants in those calls.   Those identifications are based on a combination of several facts, including the following:  (1) intercepted statements concerning the user's location or activity that were consistent with ongoing physical or electronic surveillance; (2) cell phone subscriber information; and (3) business and court records listing the relevant cell phone for a particular Target Subject.   I base my interpretations of these communications upon my training and experience, the training and experience of other agents, and my involvement in the investigation.   Quotations from telephone conversations are based on preliminary transcripts and/or synopses ("line sheets") that are subject to revision.   All times referenced herein are approximate.

## DRUG SEIZURES (INCLUDING CONTROLLED BUYS)

### *March 30, 2021 Controlled Buy of 130 Grams of Fentanyl/Methamphetamine*

22.     On March 30, 2021, CS-1 purchased 100 grams of fentanyl from ALCANTARA for $2,400, who used RODRIGUEZ to deliver the fentanyl.   That day, under the direction and supervision of agents, at approximately 11:30 a.m., CS-1 called ALCANTARA, who was using 646-427-4933 (the "4933 Number") at the time, and requested that they meet for the fentanyl. ALCANTARA agreed and directed CS-1 to meet at 1050 Chalkstone Avenue, Providence, Rhode Island (the parking lot for the Chalkstone Supermarket).

10

23.     Agents drove CS-1 to 1050 Chalkstone Avenue.  While agents were with CS-1,
CS-1 received a call from a phone that CS-1 identified as belonging to RODRIGUEZ.  During
that call, RODRIGUEZ directed CS-1 to meet instead at 90 Miner Street, Providence, Rhode
Island.  RODRIGUEZ also asked CS-1 if he was interested in receiving an additional 30 grams
of fentanyl from RODRIGUEZ directly (separate from ALCANTARA) for $400.  CS-1, still
under the direction and control of agents, agreed.

24.     Agents then transported CS-1 to 90 Miner Street and provided him with $2,800 in
OAF, which included the $2,400 for fentanyl from ALCANTARA and the additional $400 for
fentanyl that CS-1 was to obtain directly from RODRIGUEZ.  Agents observed RODRIGUEZ
sitting inside the driver's seat of a black Toyota Camry (the "Toyota Camry"), bearing
Massachusetts Registration 3BVD11, in front of 90 Miner Street.  CS-1 then entered into the
front passenger seat of the Toyota Camry for a few minutes.  CS-1 then returned to the agent's
vehicle and agents transported CS-1 to a separate location.

25.     At the separate location, CS-1 provided agents with thirteen cylinders containing
a brown, rock-like substance.   Confirmatory testing from the DEA Lab shows that these
substances contained approximately 127.5 grams of fentanyl and methamphetamine.  CS-1
confirmed that CS-1 received these substances in exchange for providing $2,800 OAF to
RODRIGUEZ.  CS-1 also told agents that during their short meeting, RODRIGUEZ admitted to
CS-1 that RODRIGUEZ works for ALCANTARA, and specifically that he packages and
delivers drugs for ALCANTARA.

*May 27, 2021 Controlled Buy of 50 Grams of Fentanyl*

26.     On May 27, 2021, CS-1 purchased 50 grams of fentanyl from ALCANTARA for

$1,200.  ALCANTARA used RODRIGUEZ to deliver the fentanyl.  That day, at approximately

3:05 p.m., under the direction and supervision of agents, CS-1 called ALCANTARA at 401-225-

7056, which ALCANTARA had provided as his new number to CS-1 during a phone call on

May 18, 2021.  ALCANTARA directed CS-1 to meet his courier at 90 Miner Street, Providence,

Rhode Island.

27.     At 4:00 p.m., agents drove CS-1 to 90 Miner Street.  Agents observed

RODRIGUEZ sitting in the driver's seat of a black Nissan Rogue, bearing Massachusetts

Registration 2DEG29 (the "Nissan Rogue"), parked in front of 90 Miner Street.  CS-1 then

exited the agent's vehicle and entered the front passenger's seat of the Nissan Rogue.  Several

minutes later, CS-1 exited the Nissan Rogue and returned to the agent's vehicle.

28.     Agents then transported CS-1 to a separate location, where CS-1 provided them

with five baggies containing a brown, rock-like substance.  Based on my training and experience,

I believe that these baggies contained fentanyl.  Confirmatory testing from the DEA Lab shows

that that these substances contained approximately 49 grams of fentanyl.  CS-1 stated that again

RODRIGUEZ talked about ALCANTARA.  RODRIGUEZ said that he cooked, pressed,

packaged and delivered drugs for ALCANTARA, but he only received between $1,000 and

$5,000 for every $20,000 in drugs that he delivered for ALCANTARA.

*November 30, 2021 Controlled Buy of 100 Grams of Fentanyl*

29.     On November 30, 2021, CS-1 purchased 100 grams of fentanyl from

ALCANTARA for $2,500, who used ORTIZ to deliver the fentanyl.  On the previous day,

November 29, 2021, under the direction and supervision of agents, CS-1 texted ALCANTARA, using the 4933 Number, requesting "10." Based on my training and experience and knowledge of the investigation, I interpret 10 to signify 100 grams of fentanyl.

30.     The next day, ALCANTARA and CS-1 agreed to meet at 1050 Chalkstone Avenue in Providence, Rhode Island. At approximately 1:47 p.m. on November 30, 2021, agents drove CS-1 to the parking lot of 1050 Chalkstone Avenue. CS-1 got out of the agent's vehicle and into the rear passenger seat of a Silver Honda Accord (hereinafter, the "Accord"), bearing Massachusetts Registration 2EPJ18, which was parked in the lot. Agents further observed ORTIZ sitting in the front passenger seat of the Accord.

31.     About two minutes later, CS-1 exited the Accord and returned to the agent's vehicle. The agents and CS-1 then returned to a pre-determined location, where CS-1 provided 10 cylinders of a pressed off-white powder. CS-1 told agents that while he was in the Accord, ORTIZ gave him 10 cylinders in exchange for the $2,500 in OAF. The substance was sent to the DEA Laboratory, which confirmed that it contained about 98.57 grams of fentanyl.

32.     Agents simultaneously maintained surveillance of the Accord and, as explained below, witnessed ORTIZ meet with ALCANTARA, corroborating the evidence that ORTIZ was a courier for ALCANTARA. Agents observed the Accord drive to the back parking lot of the Dubai Barbershop located at 728 Broad Street in Providence, Rhode Island. There, agents observed ORTIZ exit the Accord and meet with ALCANTARA in the parking lot of the barbershop. This meeting was brief. ORTIZ then returned to the Accord and left the area. ALCANTARA was seen getting into the front passenger seat of a Gray Nissan Altima, bearing NY Registration KGA9560. An unknown Hispanic male was operating the Altima and

13

the vehicle departed the area.  Based on my training and experience, I believe that the short meeting between ORTIZ and ALCANTARA is consistent with ORTIZ providing the drug proceeds that he had just received from CS-1 to ALCANTARA.

***January 21, 2022 Controlled Buy of 100 Grams of Fentanyl***

33.     On January 21, 2022, CS-1 purchased 100 grams of fentanyl from ALCANTARA, who used FNU LNU 1, an unknown Hispanic Male, as his courier.  As described below,  ALCANTARA was actually present in the same parking lot where the controlled buy occurred.

34.     That day, under the direction and supervision of agents, at approximately 12:20 p.m., CS-1 made a consensually-recorded call to ALCANTARA, who was using Target Telephone 1.  During that call and several more calls and text messages, ALCANTARA agreed to supply CS-1 with 100 grams of fentanyl and to meet at the Market Basket Supermarket in New Bedford, Massachusetts.  At approximately 2:00 p.m., agents transported CS-1 to the Market Basket.  CS-1 and two agents entered the store to wait for ALCANTARA's courier.  At approximately 3:35 p.m., after calling CS-1 several times to tell him that he was running late, ALCANTARA arrived at the Market Basket parking lot in the front passenger seat of a Ford Edge, bearing Massachusetts registration 2BFD59 and registered to Karla Rivera-Rodriguez (the "Ford Edge").  Based on surveillance and information from other law enforcement agents, I believe that Rivera-Rodriguez is ALCANTARA's girlfriend.  At 3:38 p.m., CS-1 exited the Market Basket and approached ALCANTARA who was now standing outside the Ford Edge.  Agents observed ALCANTARA direct CS-1 to go to a Silver Jeep Cherokee, bearing Rhode

Island registration 300591 (the "Silver Jeep"), telling CS-1, "It's over there, by that Jeep.  It's over there."  CS-1 got into the driver's seat of the Silver Jeep, then exited within moments.

35.      Agents debriefed CS-1 at another location, where he provided them with a bag containing ten compressed powder units in a cylinder shape that he said he obtained from an unknown Hispanic male in the Silver Jeep in exchange for $2,500 in OAF.  Based on my training and experience, and the appearance of the substance, I believe that the substance in the bag contained fentanyl.  Agents sent this substance to the DEA lab for testing and results are pending.

***April 11, 2022 Seizure of 180 Grams of Fentanyl from BARTHOLOMEW and DiGerolomo***

36.      On April 11, 2022, agents stopped BARTHOLOMEW and a second female, DiGerolomo after they met with ALCANTARA's courier, FNU LNU 1.  Agents recovered approximately 170 grams of suspected fentanyl from BARTHOLOMEW and DiGerolomo during the stop.

37.      The day before, on April 10, 2022, at 7:57 p.m., BARTHOLOMEW, using 774-400-3307[4], texted ALCANTARA[5] that she wanted drugs the next day ("I'm comin [sic] tomorro [sic].") (Session 399).  ALCANTARA responded, "Ok."  (Session 400).  The next day, April 11, 2022, at 9:56 a.m., ALCANTARA texted BARTHOLOMEW, "LMK when your [sic] up,"

---

[4] Unless otherwise noted, BARTHOLOMEW used this number for all communications to/from ALCANTARA described herein.

[5] Unless otherwise noted, all communications from the wiretap referenced herein with ALCANTARA were over Target Telephone 2.

(Session 402) and she responded that she was "leaving soon." (Session 404). ALCANTARA instructed BARTHOLOMEW in subsequent texts to meet at 295 Academy Street, Providence, Rhode Island. (Sessions 411, 413).

38.     At approximately 10:56 a.m., agents conducting surveillance observed FNU LNU 1 walk from the direction of 66 Health Avenue, Providence, Rhode Island. Later, at approximately 11:24 a.m., agents observed FNU LNU 1 enter 602 Eastern Avenue, Fall River, Massachusetts ("Target Location # 1"), while carrying a bag. Next, at approximately 11:32 a.m., agents observed FNU LNU 1 exit the front door of Target Location # 1, walk around the residence and come out of the back parking lot onto adjacent Horton Street. Agents then observed FNU LNU 1 enter the front passenger side of the Silver Jeep.

39.     BARTHOLOMEW texted ALCANTARA at 12:30 p.m. that she wanted 170 grams of fentanyl ("17") (Session 418). At approximately 1:03 p.m., agents observed a red Honda bearing Massachusetts registration 2GPK64 and registered to BARTHOLOMEW (the "Red Honda") arrive at the Walgreen's, located at 295 Academy Avenue, Providence, Rhode Island. Agents observed BARTHOLOMEW driving the vehicle and DiGerolomo in the front passenger seat.

40.     At approximately 1:23 p.m., agents observed ALCANTARA, FNU LNU 1, and two females on the front porch of 66 Health Avenue, Providence, Rhode Island. At approximately 1:31 p.m., agents observed FNU LNU 1, while wearing a camouflaged-colored hat, exit from the driveway of the ALCANTARA residence and walk towards Academy Avenue in Providence, Rhode Island. At approximately 1:39 p.m., agents observed FNU LNU 1 enter

16

the rear passenger seat of the Red Honda and then exit the car a moment later.  At approximately 1:42 p.m., the Red Honda exited the Walgreen's parking lot.

41.     Agents continued surveillance of the Red Honda.  At approximately 3:25 p.m., Yarmouth, Massachusetts Police stopped the Red Honda.  Officers recovered 90 grams of suspected fentanyl, which BARTHOLOMEW concealed in her bra, and 80 grams of suspected fentanyl from DiGerolomo, which was concealed in her bra.  Field testing showed that the substances tested positive for the presence of fentanyl.

42.     Later that day, BARTHOLOMEW called ALCANTARA and asked for more fentanyl, lying to him by saying that some of the fentanyl seized by police went down the toilet. ("Okay, so I gave my people theirs and when I went to take mine out, it fell in the toilet.  And now I'm with nothing.")  (Session 476).  ALCANTARA responded that he could not meet with her because he was going to New York ("I'm sorry man, I'm on my way to New York."). BARTHOLOMEW then asked if they could meet the next day, i.e. April 12, 2022 ("Okay, so tomorrow then?") and if it "could be early" because she did not have any more drugs ("I don't have nothing, bro.").  ALCANTARA responded, "Ok."  As described below, surveillance and intercepted calls showed that ALCANTARA's courier and BARTHOLOMEW did in fact meet the following day, April 12, 2022, for a drug deal.

**THE TARGET SUBJECTS**
**RELATIONSHIPS AND DRUG TRAFFICKING ACTIVITIES**

43.     As described above and below, ALCANTARA manages and controls a DTO whose customers are BARTHOLOMEW, COLLAZO, CRUZ, PACHECO and SANTIAGO.  As described above and below, ALCANTARA's employees include ORTIZ, RODRIGUEZ and FNU LNU 1.  In this section, I describe the relationships among the Target Subjects and detail

intercepted calls and surveillance that explain the nature and scope of their drug trafficking business and roles in the conspiracy.

**ALCANTARA-BARTHOLOMEW-FNU LNU 1**

*April 4, 2022 - BARTHOLOMEW Acquires Drugs from FNU LNU 1 at Fall River Wal-Mart*

44.     On April 4, 2022, as described below, ALCANTARA arranged a fentanyl deal with BARTHOLOMEW (using phone number 774-400-3307)[6] that took place in the diaper aisle of the Fall River, Massachusetts Wal-Mart.  That morning, at approximately 10:46 a.m., BARTHOLOMEW called ALCANTARA and told him she was coming in a few hours ("It's gonna be like an hour and a half, two (2) hours.") (Session 103).  At 10:49 a.m., ALCANTARA texted BARTHOLOMEW to travel to the Fall River Wal-Mart ("the same place"), where they had previously conducted drug deals ("Let me know so I can see you in the same place that I saw you that's fine but you throw me when you're 1 hour away at what time do you plan to come?").[7] (Session 104).

45.     At 12:34 p.m., BARTHOLOMEW texted ALCANTARA that she had arrived at Wal-Mart ("I'm here.") (Session 124).  ALCANTARA texted back that he was still an hour away ("I told you to throw me when I had an hour because I'm not in the area, I can see you in about an hour I can see you.") (Session 125). At 1:20 p.m., BARTHOLOMEW texted

---

[6] Unless otherwise noted, BARTHOLOMEW used this number for all communications to/from ALCANTARA described herein.

[7] Based on the investigation, agents believed that "the same place," referred to the Fall-River Wal-Mart, where it was believed that ALCANTARA and BARTHOLOMEW had previously conducted a drug deal.

ALCANTARA indicating that she had purchased items inside the store ("I'm checking out and going to put stuff in the car.") (Session 138). ALCANTARA, consistent with the behavior of a narcotics dealer who seeks to avoid law enforcement detection, told BARTHOLOMEW to return to the store because it was "less suspicious" ("No better keep going back there like that it's less suspicious I'm on my way.") (Session 139). At 1:55 p.m., ALCANTARA instructed BARTHOLOMEW to meet his courier in the diaper aisle ("I'm here go for the Pampers."). (Session 149).

46.     Surveillance video from Wal-Mart (depicted below) showed an individual appearing to be BARTHOLOMEW meet in the diaper aisle with an individual appearing to be FNU LNU 1, where he placed a white-colored item on the shelf and BARTHOLOMEW quickly retrieved it:



47.     The quick encounter, white-colored item and movement of hands are all consistent, based on my training and experience, with an illegal narcotics transaction. Both parties purchased diapers and then departed the store. I believe that FNU LNU 1 and BARTHOLOMEW purchased the diapers in an effort to conceal their drug deal and make it appear that their visit to Wal-Mart was for legitimate purposes.

*April 11, 2022 - BARTHOLOMEW Acquires Drugs from FNU LNU 1 at Fall River Price Rite*

48.     As described above, after agents seized 90 grams of fentanyl from BARTHOLOMEW on April 11, 2022, she called ALCANTARA and told him that she needed more drugs because she had lost the fentanyl "in the toilet."

49.     The next day, on April 12, 2022, as described below, ALCANTARA supplied BARTHOLOMEW with more drugs at the Price Rite parking lot in Fall River. At 12:13 a.m. that day, ALCANTARA texted BARTHOLOMEW the meeting spot of Price Rite ( "866 pleasant st, fall rivel [sic] 02723.") (Session 489). BARTHOLOMEW responded, "Ok." (Session 491). At 6:39 a.m., BARTHOLOMEW texted that she wanted 50 grams of fentanyl ("5.") (Session 498). Then at 7:19 a.m., BARTHOLOMEW texted ALCANTARA that she was en route to Price Rite ("I'm omw," which I interpret to mean "I'm on my way.") At 7:48 a.m., ALCANTARA received a text from 508-737-6378 (the "6378 Number") that said, "I have this phone mine just died." Based on the timing of this text and subsequent texts from this phone, I believe BARTHOLOMEW was using the 6378 Number.

50.     Meanwhile, at approximately 8:16 a.m., a pole camera installed near 66 Health Avenue, Providence, Rhode Island, showed ALCANTARA and Rivera-Rodriguez depart 66

Health Avenue, Providence, Rhode Island.  Agents observed ALCANTARA carrying a large

duffle bag and place the bag in the rear passenger compartment of the Ford Edge.

ALCANTARA then got into the front passenger seat of the car and Rivera-Rodriguez got into

the driver's seat and the car pulled away.  At approximately 8:48 a.m., a pole camera near 602

Eastern Avenue, Fall River, Massachusetts (Target Location # 1), showed ALCANTARA walk

to the front door of 602 Eastern Avenue carrying the large duffle bag and enter the residence.  At

this same time, ALCANTARA received a text message from the BARTHOLOMEW asking if

she should enter the Price Rite ("Should I go in.")  (Session 524)  At 9:02 a.m., ALCANTARA

texted that he was 20 minutes away ("20 min") (Session 532).  In the meantime, about eight

minutes later, at approximately 9:10 a.m., the pole camera showed FNU LNU 1, also enter 602

Eastern Avenue, Fall River, Massachusetts.

     51.     Two minutes later, at 9:12 a.m., ALCANTARA departed 602 Eastern Avenue, got

back into the Ford Edge and the car departed the area.  Based on my training and experience, I

believe that ALCANTARA likely transported drugs to Eastern Avenue in the bag and that FNU

LNU 1 arrived to then deliver the drugs.

     52.     At 9:19 a.m., agents conducting surveillance observed the Silver Jeep and the

Ford Edge arrive simultaneously at the Price Rite Supermarket at 866 Pleasant Avenue, Fall

River, Massachusetts.  Prior to this, agents saw FNU LNU 1 leave 602 Eastern Avenue, but

agents did not see if FNU LNU 1 got into the Silver Jeep.  At approximately 9:20 a.m., agents

observed BARTHOLOMEW approach the Silver Jeep on foot, stand at the vehicle briefly, and

then walk away.  Agents were not able, however, to observe BARTHOLOMEW's interaction

such as arm or hand movements when she approached the Silver Jeep.  The Silver Jeep and Ford

Edge then departed the area.  BARTHOLOMEW and an unknown male then walked into the Price Rite Supermarket for a brief time before departing in a GMC Sierra bearing Massachusetts registration SR535J (the "GMC Sierra") and registered to a male not believed to be a part of this investigation.

***June 6, 2022 - BARTHOLOMEW Acquires Drugs from FNU LNU 1 at 1050 Chalkstone Avenue***

53.     On June 6, 2022, ALCANTARA supplied drugs to BARTHOLOMEW in the parking lot of 1050 Chalkstone Avenue, which is the address for the Chalkstone Supermarket. That deal was coordinated the day before, June 5, 2022.

54.     On June 5, 2022,  at approximately 7:08 p.m., BARTHOLOMEW texted ALCANTARA, "Hi I'm coming in the morning," (Session 1498), and ALCANTARA responded, "Ok."  (Session 1502).  ALCANTARA further stated, "But in Providence not Fall River."  (Session 1505).  On June 6, 2022, at 7:30 a.m., BARTHOLOMEW texted ALCANTARA, "I'm omw [on my way]."  (Session 1511).  At 8:21 a.m., ALCANTARA texted BARTHOLOMEW, "1050 Chalkstone Av" and "Providence."  (Sessions 1523 and 1525).   At 8:55 a.m., BARTHOLOMEW texted ALCANTARA, "3 min."

55.     Just minutes before this, agents monitoring a pole camera, saw FNU LNU 1 exit 66 Health Avenue, Providence, Rhode Island, on foot.  Within approximately five minutes, at 8:59 a.m., agents observed FNU LNU 1 arrive on foot at the parking lot for 1050 Chalkstone Avenue.  According to Google Maps, 1050 Chalkstone Avenue is a short walk of only .7 miles away from 66 Health Avenue.  Also at 8:59 a.m., agents observed the GMC Sierra arrive in the parking lot, as well.  Agents positively identified BARTHOLOMEW as sitting in the front passenger seat of the GMC Sierra.   Agents then observed FNU LNU 1 approach the GMC

Sierra.  Agents could not, based on their vantage point, observe the interaction between FNU LNU 1 and the GMC Sierra.  However, within a few minutes, FNU LNU 1 then departed the side of the GMC Sierra, and walked into the Chalkstone Supermarket.  At 9:02 a.m., the GMC Sierra exited the parking lot and at 9:08 a.m., FNU LNU 1 exited the Chalkstone Supermarket, carrying a brown bag, and walked directly back to 66 Health Avenue, where he was observed entering at 9:15 a.m.

56.     At 9:16 a.m., agents observed ALCANTARA exit 66 Health Avenue and enter the driver's side of the Ford Edge.  The vehicle did not move.  At 9:20 a.m., FNU LNU 1 exited 66 Health Avenue, appeared to hand something to ALCANTARA through the driver's side of the Ford Edge, and FNU LNU 1 then returned inside to 66 Health Avenue.  The Ford Edge then departed the area.  Based on my training and experience, and knowledge of the investigation, FNU LNU 1's hand motion towards the window of the Ford Edge where ALCANTARA was seated, is consistent with him handing drug proceeds to ALCANTARA that FNU LNU 1 had just received from BARTHOLOMEW in the parking lot at 1050 Chalkstone Avenue.

### *June 11, 2022 - BARTHOLOMEW Acquires Drugs from FNU LNU 1 at 1050 Chalkstone Avenue*

57.     More recently, on June 11, 2022, at approximately 7:07 a.m., BARTHOLOMEW texted ALCANTARA that she was on her way to see him ("OMW").  (Session 1661).  BARTHOLOMEW and ALCANTARA then exchanged several more text messages regarding their whereabouts, including ALCANTARA texting that he was "maybe 10 min. away" and BARTHOLOMEW responding, "Okay."  (Sessions 1669 and 1672).  Agents did not conduct surveillance that day, but based on my training and experience, and knowledge of the investigation, I believe that "OMW" meant that BARTHOLOMEW was en route to meet with

23

ALCANTARA's courier to obtain more drugs.  My belief is corroborated by later texts between BARTHOLOMEW and ALCANTARA in which she complained about the potency of the fentanyl that she received.  Specifically, at 2:51 p.m., BARTHOLOMEW texted ALCANTARA that four people had said the fentanyl was not as strong as before ("Everyone saying to me lately that it's not as strong like 4 different ppl [people] have said it to me.").  (Session 1684).  Based on my training and experience, and knowledge of the investigation, I believe that the "4 different people" are customers to whom BARTHOLOMEW distributed the fentanyl that she obtained from ALCANTARA.

58.     I believe that BARTHOLOMEW continues to engage in the Target Offense.  On or about June 17, 2022, CS-1 advised agents that ALCANTARA had called CS-1 and told CS-1 that ALCANTARA had a new telephone, 774-456-9408 (the "ALCANTARA New Phone").  CS-1 advised that ALCANTARA had just notified CS-1 of the new phone number.  Simultaneously, agents observed use of Target Telephone 2 to drop precipitously.  Toll records for the ALCANTARA New Phone show this phone had 60 calls/text messages with BARTHOLOMEW between June 15, 2022 and July 5, 2022.  I believe that these continued contacts are drug related and that BARTHOLOMEW continues to commit the Target Offense.

[CONTINUED ON NEXT PAGE]

**ALCANTARA-COLLAZO-FNU LNU 1**

***March 31, 2022 – COLLAZO Acquires Drugs from FNU LNU 1 at 163 Chestnut***

59.     On March 31, 2022, at approximately 1:19 p.m., ALCANTARA called COLLAZO (using 774-534-8812).[8]  (Session 26).  After exchanging pleasantries, COLLAZO told ALCANTARA that he had money for 150 grams of drugs ("I have yours from the other time" and "What I forgot, and I have for the 15 that you brought to me.").  ALCANTARA responded that COLLAZO owed $4,200 for the 150 grams of drugs and another $1,100 as well ("Listen, the 15 is 4,200 . . ." and then added "plus 1,100 pesos that you still owe me.").  ALCANTARA then said, "Okay, so you have 5,300."   COLLAZO then asked if ALCANTARA could sell him 200 grams on consignment ("I wanted to see if you could front me 20.").  ALCANTARA responded, "Okay, fine."  ALCANTARA then asked COLLAZO if he was ready to receive drugs that day ("You are ready for today, right?").  COLLAZO responded, "Yes, yes."

60.     Then, at approximately 1:35 p.m., COLLAZO texted to confirm what he owed ALCANTARA ("Just to make sure . . I am giving you 5200 . . . plus 2500, so 7700." (Session 28).  ALCANTARA then responded at 1:36 p.m. (Session 29) and told COLLAZO that he owed a total of $7,800 ("5300 plus 2500, so 7800").  Then at 2:10 p.m., (Session 32), COLLAZO responded that he had $7,700 for ALCANTARA, acknowledged that he owed him another $100, but he did not have access to all of his drug proceeds at his location ("Ok, so I have 77, my other money doesn't stay here, but I owe you the hundred.").

---

[8] Unless otherwise noted, COLLAZO used this number for all communications to/from ALCANTARA described herein.

61.     Based on these calls, agents began surveillance.  At approximately 2:42 p.m., an agent observed the Silver Jeep parked across the street from 163 Chestnut Street, New Bedford, Massachusetts, which is the residence of COLLAZO.  In the meantime, at approximately 2:43 p.m., ALCANTARA called COLLAZO and said, "I'm down here," and COLLAZO responded, "Go ahead."  (Session 35).

62.     Agents then observed FNU LNU 1 walk behind the Silver Jeep from the passenger side and to the rear of 163 Chestnut Street.  Within two minutes, at approximately 2:44 p.m., agents observed FNU LNU 1 return to the Silver Jeep.  The Silver Jeep then left the vicinity of 163 Chestnut Street.  Agents observed the Silver Jeep get back onto Interstate 195 West towards Providence and then terminated surveillance.  Based on my training and experience and knowledge of the investigation, I believe that FNU LNU 1 distributed drugs to COLLAZO at 163 Chestnut Street.  The short nature of FNU LNU 1's visit to this location, combined with the intercepted communications, indicate that this was a drug deal.

**April 15, 2022 - COLLAZO Accuses ALCANTARA's Associate of Stealing From Him**

63.     On April 15, 2022, ALCANTARA called COLLAZO (Session 623).  During the call, COLLAZO told ALCANTARA that "Jordan," who agents believe to be Jordan Lopez (born 1991), had stolen a half finger [9] of drugs from COLLAZO's residence and that COLLAZO had a camera that recorded the incident ("I do not know what is going on with your people, but I have Jordan on camera walking inside my house and now I am missing half of a finger.").  Next,

---

[9] Based on my training and experience, I know that a finger refers to 10 grams of drugs, so a half finger would be approximately 5 grams.

ALCANTARA indicated to COLLAZO that he was going to call "Jordan" to confront him about COLLAZO's accusation ("Let me see if he picks up. Hold on.").  Agents then heard ALCANTARA engaging in a conversation on a different phone.  ALCANTARA remained on the line with COLLAZO while having this separate conversation.  ALCANTARA was heard saying, "He told me he has you recorded on camera, and he says that you supposedly took five." Agents were not able to hear the response by the person on the other line to ALCANTARA's question, but ALCANTARA was heard repeating COLLAZO's claim ("He says you went inside his house without his permission, and he has you recorded.").  ALCANTARA then was heard saying, "I will call you right back Jordan."  I believe that "Jordan" works for ALCANTARA as COLLAZO referred to him as "your people."

64.     ALCANTARA then appeared to terminate the call on the second line and returned his attention to COLLAZO.  ALCANTARA warned COLLAZO about sharing his business with Jordan ("I told you the other time not to be telling Jordan anything about your stuff."). COLLAZO then admitted to ALCANTARA that he had "left the door open" of his house when he went "to walk the dogs," intimating that this was when Lopez came into his house. COLLAZO further added, "He left my house. I saw him." ALCANTARA responded that COLLAZO could deal with the situation as COLLAZO saw fit ("Well pai.  What can I tell you? You saw that I called him and he did not respond.  Do whatever you have to do.  Understand?") ALCANTARA told COLLAZO that he could not resolve COLLAZO's dispute with Lopez ("I cannot do anything with that.").

65.     Based on my knowledge of this case, and my experience as a New Bedford detective, I am familiar with a drug user by the name of Jordan Lopez and believe that he is the

"Jordan" with whom ALCANTARA spoke.  According to a law enforcement database, agents
identified Lopez as the user of the phone number with 508-863-5036 (the "5036 Number").
Agents obtained subscriber information from Sprint for the 5036 Number, which showed Lopez
as the subscriber of record with an address of 22 Peckham Street, Apartment # 3 in New
Bedford, Massachusetts.  Toll records for the 5036 Number show that at the time of the call
above between ALCANTARA and COLLAZO, the 5036 Number was in contact with 917-385-
5359 (the "5359 Number"), a T-Mobile phone with no associated subscriber of record.  Toll
records for the 5359 Number show this call as the only call for that phone on this day.  I believe
that ALCANTARA is in fact the user of the 5359 Number because toll records for the 5359
Number show this number (a) calling Target Telephone 3 (based on my training and experience,
likely to check voicemail on Target Telephone 3) and (b) calling COLLAZO at 774-534-8812.[10]

***May 23, 2022 – COLLAZO Acquires Drugs from FNU LNU 1 at 163 Chestnut Street***

66.     On May 23, 2022, at 10:02 a.m., COLLAZO called ALCANTARA and said he
had drug money for him ("Umm, I have that for you . . . to see if you want to stop by."  (Session
1236).  ALCANTARA said his courier was near COLLAZO and that he might be able to stop by
("Yeah, I think I am near there.  Let me see if I pass by there now.").  COLLAZO also asked for
20 grams of drugs ("Listen, can you bring me two?").  ALCANTARA then said that he had to

_____

[10] After approximately April 29, 2022, toll records indicated very minimal usage of the 5359
Number.

check with his courier and then would call COLLAZO back ("Let me see . . . Let me call . . . I will call you back.").

67.    In the meantime, at 10:11 a.m., agents observing a pole camera in the vicinity of 602 Eastern Avenue, Fall River, Massachusetts, observed a Nissan Versa, bearing Colorado registration 698XBN (the "Nissan Versa"), parked on Bogle Street in Fall River.   Bogle Street is one block from Eastern Avenue.  Horton Street is a cross street between Bogle Street and Eastern Avenue.

68.    Agents then observed FNU LNU 1 exit the front passenger seat of the Nissan Versa, walk from Bogle Street onto Eastern Avenue and then enter the front door of 602 Eastern Avenue.  About four minutes later, at 10:15 a.m., FNU LNU 1 exited 602 Eastern Avenue, re-entered the front passenger seat of the Nissan Versa and the vehicle departed the area.

69.    At 10:29 a.m., ALCANTARA called COLLAZO back and told him to put the drug money in the drop location as his courier was close by ("Pai, put that there that I am already almost there.").   COLLAZO confirmed that ALCANTARA was also sending the 20 grams ("Is he coming with the two as well?").  ALCANTARA affirmed.  COLLAZO also told ALCANTARA that he was going to leave $6,100 for him ("I am going to put . . . 6,100 pesos."). ALCANTARA and COLLAZO then discussed COLLAZO's outstanding drug debt, with ALCANTARA telling COLLAZO that he owed $7,650 ("It's 7,650 that you have to give me."). COLLAZO then inquired if he could give ALCANTARA only $7,500 ("Can I give you 7,500 right now?"), and ALCANTARA responded that would be okay ("Pai, you know that for you, that is not a problem with me.  No worries.").  ALCANTARA then told COLLAZO that the courier had arrived ("Get going, that he is already there.").

70.     At 10:34 a.m., surveillance observed the Nissan Versa arrive at 163 Chestnut Street, New Bedford, Massachusetts.  The car parked in front of the house.  FNU LNU 1 exited the front driver's seat and walked into the driveway of the residence.  For operational reasons, agents were not able to see what exactly transpired when FNU LNU 1 entered the driveway of 163 Chestnut Street, but by 10:35 a.m., FNU LNU 1 returned to the Nissan Versa and the car departed the area, and as described below in paragraph 104, then traveled to 3 Granite Street, Taunton, Massachusetts.  Based on my training and experience, and knowledge of the investigation, I believe that FNU LNU 1 delivered drugs to COLLAZO during this visit to 163 Chestnut Street.

**May 27, 2022 - COLLAZO Acquires Drugs from FNU LNU 1 at 163 Chestnut Street**

71.     On May 26, 2022, at 4:05 p.m., COLLAZO called ALCANTARA and ordered drugs for the next day ("Tomorrow")  (Session 1253).  ALCANTARA asked if they could meet in the morning ("Okay, early?") COLLAZO responded that he wanted 600 grams and affirmed they could meet early ("60" and "Yes, early.").

72.     The next day, May 27, 2022, at 7:51 a.m., COLLAZO texted ALCANTARA to schedule the drug deal ("What time do you think?")  (Session 1315).  At 8:08 a.m., COLLAZO texted ALCANTARA that he had a customer waiting with $20,000 for drugs ("I have someone waiting with 20 thousand.")  (Session 1325).  ALCANTARA responded, "Ok."  (Session 1326).

73.     At approximately 8:40 a.m., a pole camera showed the Nissan Versa parked on Horton Street near 602 Eastern Avenue, Fall River, Massachusetts.  FNU LNU 1 exited the front passenger seat of the Nissan Versa, and entered the front door of 602 Eastern Avenue.  At 8:49 a.m., agents observed FNU LNU 1 exit the front door of 602 Eastern Avenue and re-enter the

front passenger seat of the Nissan Versa and the vehicle departed the area.   At 8:50 a.m.,
COLLAZO called ALCANTARA and ALCANTARA said his courier was en route ("Dude, I am
already on my way."). (Session 1336).  COLLAZO responded, "Okay, go on."  At 9:06 a.m.,
ALCANTARA called COLLAZO and instructed him to put the drug money in their agreed upon
drop location ("Dude, put that there . . . I am about to get there." ) (Session 1337).  COLLAZO
responded, "Okay."

74.     Two minutes later at 9:08 a.m., agents observed COLLAZO exit the front door of
163 Chestnut Street, New Bedford, Massachusetts and walk to the top of his driveway.  At the
same time as COLLAZO walked to the top of the driveway, the Nissan Versa arrived in front of
163 Chestnut Street.  FNU LNU 1 exited the vehicle and walked into the driveway and in the
same direction as COLLAZO.  Agents could not see exactly what transpired in the driveway
based on their vantage point.  At 9:09 a.m., agents observed FNU LNU 1 return to the front
passenger seat of the Nissan Versa and the vehicle departed the area.

75.     Later that morning, at 10:13 a.m., ALCANTARA called COLLAZO and said that
he owed him $980 ("You still owe me 980, right?") (Session 1388).  COLLAZO responded that
he had paid ALCANTARA $7,500 ("No, I gave you 7,500.").  ALCANTARA responded that
COLLAZO was actually $1,000 short ("No, there is 6,500 here; that's what's here, 6,500.").
ALCANTARA then corrected himself and said, "there is 6,490."  COLLAZO then complained
that his customers had given him the wrong amount ("What the fuck bro? It's that these people
give it to me like that and they tell me that its . . ." ). ALCANTARA then counseled COLLAZO
to count his drug money and not trust drug customers ("No, you have to count it, dude.  When
they give you the money and say, 'There you go,' you have to count it.  You cannot take their

31

word for it."). COLLAZO responded, "Okay." I believe that ALCANTARA's advice to COLLAZO about counting cash and not fully trusting COLLAZO's drug customers shows ALCANTARA's experience as a drug dealer in dealing with associates and customers who have deceived him previously.

***June 14, 2022 - COLLAZO Orders 30 Grams and Expresses Concern About "Jordan"***

76.     On June 14, 2022, at 7:55 a.m., COLLAZO texted ALCANTARA that he wanted 30 grams of drugs ("Bring me three"). (Session 1703). At 7:56 a.m., COLLAZO texted back, "Good now/already." (Session 1705). At 9:07 a.m. ALCANTARA called COLLAZO and instructed him to leave the cash as he was close by ("Pai, I am almost there. Put that there . . . No worries." ). (Session 1719). COLLAZO responded, "Okay, go on. Go ahead." Based on my training and experience, and knowledge of the investigation, I believe that COLLAZO requested 30 grams of drugs and ALCANTARA agreed to deliver it, while also requesting that COLLAZO leave his payment in the agreed-upon drop location.

77.     At 9:12 a.m., COLLAZO texted ALCANTARA that he did not want ALCANTARA sending "Jordan" (again, I believe Jordan Lopez) to COLLAZO's house ("Pai, please do not send Jordan to my house." ) (Session 1721). COLLAZO added in a separate text, "I did not want him to know what I had because if something happens, he is going to snitch on you and he is going to snitch on me. And he already said that. He said it to my friend, 'If I have to snitch, I will snitch. I do not care. I have a daughter.'" (Session 1728). ALCANTARA responded, "That is fine." (Session 1732).

78.     At 9:21 a.m., on the same topic, COLLAZO texted that he did not want "Jordan" to disrupt COLLAZO and ALCANTARA's profitable and lucrative drug businesses ("That is

32

fine and it is for you too.  What you and I have, we both make $,understand? I do not want to

fuck that up because of him, but thanks pai.")  (Session 1740).  ALCANTARA responded, "That

is fine pai. That is the way it will be."  (Session 1741).  Based on my training and experience,

and knowledge of the investigation, I believe that COLLAZO's concern about Jordan being a

"snitch" is an acknowledgement by COLLAZO of his and ALCANTARA's involvement in

illegal narcotics trafficking.  Moreover, COLLAZO's statement "we both make $," suggests that

ALCANTARA and COLLAZO in fact manage and operate a lucrative drug trafficking business

that could be jeopardized by a "snitch."[11]

***June 17, 2022 - COLLAZO Acquires Drugs from FNU LNU 1 at 163 Chestnut Street***

79.     On June 17, 2022, agents observed what they believe to be, based on training and

experience and knowledge of the investigation, to have been a drug deal between COLLAZO

and ALCANTARA.  That day, at approximately 7:53 a.m., a pole camera showed FNU LNU 1

enter the front door of 602 Eastern Avenue, Fall River, Massachusetts.  At 7:56 a.m., agents saw

FNU LNU 1 exit the front door of 602 Eastern Avenue, walk onto Horton Street (adjacent to

Eastern Avenue) and enter the front passenger seat of the Ford Edge.  Agents did not observe the

---

[11] Three days earlier, on June 11, 2022, ALCANTARA discusses money with COLLAZO in a manner that shows the illegal nature of their dealings.  That day, at approximately 10:02 a.m., Session 1680, ALCANTARA called COLLAZO and said, "There is some money, I don't know if it was you, but they are marked . . .Don't mark the money like that because they might not take it."  COLLAZO responded, "Okay, my bad."  Based on my training and experience, I know that cash is "marked" to trace and identify money used in illegal activities.  Therefore, I believe that ALCANTARA did not want cash from his drug deals marked because it would flag him as a drug dealer.

driver of the Ford Edge. At 8:51 a.m., agents observed the Ford Edge arrive on Chestnut Street in New Bedford, Massachusetts. FNU LNU 1 exited the front passenger seat.

80.     At 8:53 a.m., agents observed COLLAZO exit his residence, 163 Chestnut Street, New Bedford, Massachusetts, and walk towards the top of the driveway. Simultaneously, agents observed FNU LNU 1 walk in this same direction. Agents could not see exactly what transpired in the driveway based on their vantage point. However, at approximately 8:55 a.m., agents observed FNU LNU 1 exit the driveway and return to the front passenger seat of the Ford Edge, and the vehicle departed the area. At this same approximate time, agents observed COLLAZO re-enter the front door of 163 Chestnut Street. Based on my training and experience, and knowledge of the investigation, I believe that FNU LNU 1 visited 602 Eastern Avenue that morning to retrieve drugs for COLLAZO and that he then delivered the drugs to COLLAZO's residence at 163 Chestnut Street. I base my belief on the short meeting between COLLAZO and FNU LNU 1, and the intercepted calls above showing that COLLAZO receives drugs from ALCANTARA.

81.     I believe that COLLAZO continues to engage in the Target Offense. Toll records for the ALCANTARA New Phone show this phone has had 297 calls/text messages with COLLAZO between June 15, 2022 and July 2, 2022. Given the continued contact between ALCANTARA and COLLAZO, I believe that COLLAZO and ALCANTARA continue to commit the Target Offense.

**ALCANTARA-CRUZ-FNU LNU 1**

*April 1, 2022 – CRUZ Acquires Drugs from FNU LNU 1 at 56 Washburn Street*

82.     On March 31, 2022, ALCANTARA arranged a drug deal with Jason CRUZ (using 774-992-3953),[12] which occurred the next day on April 1, 2022.  On March 31, 2022 at approximately 9:46 a.m., (Session 12), ALCANTARA called CRUZ and asked if they were all set for the deal ("Tell me, bro, is everything okay around there?") and CRUZ responded that he was busy ("We already are . . . well, we are set for today, but I'm very busy today."), but he could conduct the deal the following day ("So, we are going to be set for tomorrow."). ALCANTARA agreed ("okay").

83.     Later on March 31, 2022, at approximately 7:11 p.m., CRUZ texted ALCANTARA, requesting that drugs be delivered "early" the next day ("Mi bro, what time will the man be . . send it early.")  (Session 41).  ALCANTARA responded that the drugs would be delivered at approximately 8:00 a.m. ("Ok" and "Around 8.").  (Sessions 42 and 44).  At approximately 8:30 p.m., CRUZ replied, "Ok, perfect."  (Session 47).

84.     Early in the morning of April 1, 2022, agents began surveillance at 66 Health Avenue in Providence, Rhode Island and 101 Miner Street, Providence, Rhode Island (the address to which the Silver Jeep is registered).  At approximately 7:45 a.m., agents saw the Silver Jeep depart the driveway of 101 Miner Street.  Agents did not see who was driving the vehicle or who was inside the vehicle at that time.

---

[12] Unless otherwise noted, CRUZ used this number for all communications to/from ALCANTARA described herein.

85.     At approximately 8:00 a.m., the Silver Jeep parked curbside in front of 66 Health Avenue and agents saw FNU LNU 1 approach the Silver Jeep from the direction of 66 Health Avenue and enter the front passenger side of the Silver Jeep.  The Silver Jeep then pulled away and drove to the vicinity of 602 Eastern Avenue, Fall River, Massachusetts.

86.     At approximately 8:40 a.m., agents saw the Silver Jeep park at the intersection of Eastern Avenue and Horton Street in Fall River, Massachusetts.  Agents then saw FNU LNU 1 exit the Silver Jeep.  He approached 602 Eastern Avenue from the rear of the residence, walked around the residence to the front and then approached the front door to 602 Eastern Avenue. FNU LNU 1 appeared to unlock the common door to 602 Eastern Avenue.  A few moments later, agents saw blinds on a window immediately to the left of the front door of the building on the first floor lift up briefly and then go down again as if someone was looking outside the window.  Agents then observed FNU LNU 1 leave 602 Eastern Avenue from the front door, walk to the rear of the building and re-enter the Silver Jeep, which departed the area.  Agents noted FNU LNU 1's hand in his left jacket pocket as he walked back to the vehicle, as if he were securing something in his jacket pocket.

87.     Agents continued surveillance and saw the Silver Jeep drive to the vicinity of 56 Washburn Street, New Bedford, Massachusetts, the residence of CRUZ.  Agents saw the Silver Jeep pull into the driveway of 56 Washburn Street, stay briefly, and then pull back out of the driveway and leave the area.  Based on their vantage point, agents were not able to position themselves to observe anyone come out of the residence to meet with the individuals inside the Silver Jeep.

*June 1, 2022 – CRUZ Acquires Drugs from FNU LNU 1 at 56 Washburn Street*

88.     On May 31, 2022, CRUZ ordered drugs from ALCANTARA that ALCANTARA then delivered on June 1, 2022.  Specifically, on May 31, 2022, at approximately 12:19 p.m., CRUZ ordered drugs by text ("Active/ready tomorrow.") (Session 1367).  ALCANTARA responded, "Ok bro."  (Session 1368).

89.     The next day, June 1, 2022, at approximately 8:37 a.m., agents observed the Silver Jeep arrive on Horton Street.  FNU LNU 1 exited the front passenger seat of the Silver Jeep, walked to 602 Eastern Avenue, Fall River, Massachusetts, and entered the front door.  At approximately 8:45 a.m., agents observed FNU LNU 1 exit 602 Eastern Avenue and re-enter the passenger seat of the Silver Jeep.

90.     Surveillance then followed the Silver Jeep directly from 602 Eastern Avenue to 56 Washburn Street, New Bedford, Massachusetts.  At 9:04 a.m., agents observed the Silver Jeep pull into the driveway of 56 Washburn Street, and then one minute later, the vehicle departed the area.  Based on their vantage point, agents were not able to see anyone exit the Silver Jeep before the Silver Jeep departed.  However, based on my training and experience, and knowledge of the investigation, I believe that FNU LNU 1 dropped off drugs at 56 Washburn Street that he had retrieved immediately before while at 602 Eastern Avenue, Fall River.   At 10:05 a.m., agents observed a BMW 750, bearing Massachusetts registration 2VNW14, registered to CRUZ, park in the driveway of 56 Washburn Street.  At 10:06 a.m., agents observed CRUZ enter the back door of 56 Washburn Street.

*June 5, 2022 - CRUZ orders 750 grams of drugs*

91.     On June 5, 2022, at approximately 9:07 p.m., ALCANTARA called CRUZ
(Session 1509), and they discussed drug money owed by CRUZ to ALCANTARA, as well as
CRUZ's request for 750 grams of drugs.   Early in the conversation, CRUZ told ALCANTARA
that he had left money for ALCANTARA, but removed it after it was not retrieved ("When I go
there in the morning to check in there, all the papers are still there . . . so, obviously, I took the
papers out because I am not going to leave them in there for someone.").  I know from my
training and experience that drug dealers frequently call cash "papers" and I also believe that
because CRUZ did not want to leave "the papers" this also shows the papers were in fact cash
that is inherently valuable and something CRUZ would not want to be lost or stolen.

92.     ALCANTARA then responded that he had sent his runner to retrieve the drug
money ("He went down like about an hour ago.") with CRUZ expressing regret the money was
not there ("Oh damn, my bro, you should have told me that.  The papers are there, my bro, if you
want tomorrow.").

93.     Furthermore, I believe that CRUZ had expected to receive drugs in exchange for
the money left for him ("When [I] went to check and that was not there, I said 'Damn.'" ).
CRUZ added that he had 700 grams on hand ("I still have about 70.").  CRUZ further indicated
that he had removed the cash the night before because ALCANTARA had failed to answer his
calls ("Okay no it was last night and since you did not answer me.").

94.     ALCANTARA and CRUZ then agreed to meet at a later time (ALCANTARA:
"Take it easy I will hit you up when I am coming down to get that I will hit you up you hear?").
CRUZ then affirmed ("Yes my brother you know that it is a sure thing my bro."). ALCANTARA

then confirmed that he would bring 700 grams to CRUZ ("You have to walk using 70 eyes you already know").  CRUZ responded that he actually wanted 750 grams ("70? Dude use 75, put on 5 more.").

***June 21, 2022 – CRUZ Acquires Drugs from FNU LNU 1 at 56 Washburn Street***

95.     On June 21, 2022, as described below, based on my training and experience, and knowledge of the investigation, I believe that CRUZ and ALCANTARA conducted a drug deal. That morning, at 8:47 a.m., a pole camera showed FNU LNU 1 arrive in the Ford Edge in the driveway of CRUZ's residence at 56 Washburn Street, New Bedford, Massachusetts.  The pole camera showed FNU LNU 1 exit the front passenger seat of the Ford Edge, walk to a trailer located in the back of the driveway and open the door of the trailer and enter it.  At 8:48 a.m., agents observed FNU LNU 1 exit the trailer and return back to the Ford Edge and enter the front passenger seat.  The Ford Edge was then observed backing out of the driveway at 56 Washburn Street.  At 1:51 p.m., agents observed on the pole camera CRUZ enter the door of the trailer. The pole camera showed no parties other than CRUZ enter the trailer after FNU LNU 1 exited it early that morning.  At 1:52 p.m., agents observed CRUZ exit the trailer and then walk behind the residence out of sight.  Based on my training and experience, and knowledge of the investigation, I believe that on June 21, 2022, FNU LNU 1 delivered drugs to the trailer in the driveway, and that CRUZ retrieved those drugs from the trailer when he returned home at 1:52 p.m.

96.     I believe that CRUZ continues to engage in the Target Offense. Toll records for the ALCANTARA New Phone show this phone has had 27 calls/text messages with CRUZ

between June 18, 2022 and July 5, 2022.  Given the continued contact between ALCANTARA and CRUZ, I believe that CRUZ and ALCANTARA continue to commit the Target Offense.

### ALCANTARA-PACHECO-FNU LNU 1

*April 7, 2022 - PACHECO Orders 100 Grams*

97.     On April 7, 2022, as described below, PACHECO, using 508-245-1958,[13] told ALCANTARA that he needed drugs that PACHECO intended to redistribute to a customer in Vermont.  Specifically, at 2:34 p.m., ALCANTARA called PACHECO and PACHECO asked for 100 grams of drugs ("Can you do me a favor and bring me 10?, and in 2 days I'll be ready for this?") (Session 281).  ALCANTARA then asked PACHECO to text him when he was ready ("Give me one text, okay?").  PACHECO agreed ("Okay, alright.  Thank you!").

98.     Just four minutes later, at 2:38 p.m., PACHECO texted ALCANTARA that he was going to see his customer from Vermont, and that he immediately needed 70 grams of drugs and that he would order up again from ALCANTARA in two to three days ("The guy from Vermont called me.  Can I buy seven and I'll be ready in 2 or 3 days when I get back for the usual plus extra.") (Session 285).  ALCANTARA responded, "Ok."  (Session 286).

*April 16, 2022 – PACHECO Acquires Drugs from FNU LNU 1 at 8 Arlington Street, Taunton, Massachusetts*

99.     On April 16, 2022, at 2:52 p.m., PACHECO texted ALCANTARA that he wanted to obtain drugs ("Would it be possible to see you today?") (Session 765).  ALCANTARA responded by text, "Yes."  (Session 768).  At approximately 4:37 p.m., agents observed a black

---

[13] Unless otherwise noted, PACHECO used this number for all communications to/from ALCANTARA described herein.

Ford Explorer, bearing Massachusetts registration 2DGB75, and registered to PACHECO, arrive at 8 Arlington Street, Taunton, Massachusetts, a location where I believe, based on the investigation, PACHECO stores drugs.  Based on a Massachusetts license photo, and agents' knowledge from the investigation, PACHECO was identified as the driver.  PACHECO entered the residence with what appeared to be a key in his hand.  At approximately 5:56 p.m., ALCANTARA called PACHECO and said, "Outside."  (Session 781).

100.    At this same approximate time, agents observed a black Toyota Corolla, bearing Florida registration JKUA55 (the "Toyota Corolla") pull up to the front of 8 Arlington Street. Agents conducting surveillance had identified the driver of the Toyota Corolla as Rivera-Rodriguez.  FNU LNU 1 exited the passenger side of the car, entered 8 Arlington Street, and then quickly exited the residence.  FNU LNU 1 got back into the Toyota Corolla and the car departed the area.  At approximately 6:03 p.m., agents observed PACHECO exit 8 Arlington Street and depart the area in the Ford Explorer.

101.    At approximately 6:38 p.m., agents observed the Toyota Corolla return to the vicinity of 66 Health Avenue, Providence and park on the street in front of the house next to 66 Health Avenue.  FNU LNU 1 exited the vehicle and entered 66 Health Avenue.  ALCANTARA then exited 66 Health Avenue.  Rivera-Rodriguez exited the driver's seat of the Toyota Corolla, briefly engaged with ALCANTARA, then got into the driver's seat of the Silver Jeep and departed the area.  ALCANTARA then got into the driver's seat of the Toyota Corolla, adjusted its parking spot, exited the vehicle and then returned to 66 Health Avenue.

***April 26, 2022 - PACHECO tells ALCANTARA that it has been a slow week***

102.     On April 26, 2022, at approximately 6:43 p.m., ALCANTARA called

PACHECO, who was using 508-245-1958.  (Session 1061).  Both men greeted each other and

then PACHECO commented that his drug business was not busy ("It is slow this week.").

Nevertheless, PACHECO added that he would be ready for drugs soon, stating, "So in about one

or two days."  ALCANTARA responded, "Okay then."  Later, at approximately 8:34 p.m.,

PACHECO texted ALCANTARA that he wanted to pick up drugs the following day ("I'm not

sure what time it will definitely be tomorrow brother.")  (Session 1066).

***May 23, 2022 – PACHECO Acquires Drugs from FNU LNU 1 at 3 Granite Street, Taunton, Massachusetts***

103.     On May 23, 2022, ALCANTARA delivered drugs to PACHECO that PACHECO

had ordered early that morning.  That morning at 9:02 a.m., PACHECO texted ALCANTARA,

"I will be ready in 1 hour."  (Session 1222).  At 9:03 a.m., ALCANTARA responded, "Ok" and

then stated in a separate text, "I'm going that way just to see you at 10."  (Session 1225, 1226).

104.     As described above in paragraph 70, in the deal with COLLAZO, about one hour

later, at 10:11 a.m., agents observed FNU LNU 1 exit the Nissan Versa and enter 602 Eastern

Avenue.  FNU LNU 1 then returned to the Nissan Versa, the Nissan Versa traveled to 163

Chestnut Street, New Bedford, Massachusetts for a drug deal with COLLAZO, and then, as

described below, it traveled directly to 3 Granite Street, Taunton, Massachusetts.

105.     About 20 minutes later, at 10:57 a.m., PACHECO texted ALCANTARA that he

was waiting for ALCANTARA ("I'm ready brother, I didn't know if I was supposed to let you

know.").  (Session 1242).  Agents observed the Nissan Versa arrive at 3 Granite Street, Taunton

Massachusetts, at 11:08 a.m. and pull into the driveway.  Agents also observed PACHECO

wearing a black shirt and black shorts in the driveway.  At 11:12 a.m., the Nissan Versa departed

the area.  Based on agents' vantage point, they were not able to see exactly what transpired

between PACHECO and FNU LNU 1 in the driveway, but based on prior communications

between PACHECO and ALCANTARA, I believe FNU LNU 1 delivered the drugs that

PACHECO had ordered.

***June 10 and 13 – ALCANTARA and PACHECO Discuss Law Enforcement Following Them***

106.    On June 10, 2022, ALCANTARA called PACHECO.  (Session 1603).

ALCANTARA asked, "Everything good?"  PACHECO said,  "Yes, yes."  PACHECO inquired

of ALCANTARA, "Did the car go to your house . . . the car that was behind you?"

ALCANTARA responded, "No . . . not my house."  ALCANTARA further stated, "Yea, check it

out and be careful."  PACHECO responded, "Be careful all the time."  Based on my training and

experience, and knowledge of the investigation, I believe that PACHECO was concerned ("be

careful") about law enforcement following ALCANTARA ("the car that was behind you").

PACHECO and ALCANTARA both expressed concern about being "careful" to detect any law

enforcement that might be following them.  I know, based on my training and experience, that

drug dealers like ALCANTARA and PACHECO are particularly conscious of any suspected law

enforcement presence that could interfere with and jeopardize their criminal activities.

107.    On June 13, 2022, at 6:27 p.m., PACHECO texted ALCANTARA that he was

"keeping an eye open for that car and I have not seen it at all."  (Session 1694).  I believe this

related to the call above on June 10, 2022 concerning law enforcement following

ALCANTARA.

108.     Moreover, I believe that these calls show that PACHECO and ALCANTARA are especially wary of law enforcement detection and have accordingly potentially changed their patterns of behavior to avoid law enforcement detection.  Although the last deal described above occurred on May 23, 2022, I still believe that PACHECO continues to engage in the Target Offense with ALCANTARA.  Toll records for the ALCANTARA New Phone show this phone has had 95 calls/text messages with PACHECO between June 16, 2022 and July 2, 2022.  This call history suggests that ALCANTARA and PACHECO continue to engage in narcotics trafficking with each other.  The investigation has not revealed that their relationship involves anything other than narcotics trafficking.  In short, given the continued contact between ALCANTARA and PACHECO, I believe that PACHECO continues to commit the Target Offense.

## ALCANTARA-ORTIZ-RODRIGUEZ-SANTIAGO-FNU LNU 1

### *Visits by ALCANTARA's Courier with SANTIAGO*

109.     On May 7, 2021, GPS location data for RODRIGUEZ's car showed the car travel from the vicinity of his residence in Providence, Rhode Island to the vicinity of SANTIAGO's residence in New Bedford (Target Location # 5), stay briefly and then quickly leave the area. Similarly, on September 21, 2021, agents saw ORTIZ meet briefly with SANTIAGO outside of SANTIAGO's residence in New Bedford and ORTIZ quickly departed in his vehicle after the meeting.  Based on my training and experience, these short visits by ALCANTARA's couriers with SANTIAGO are consistent with illegal drug trafficking.

*April 22, 2022 - SANTIAGO Calls to Confirm Delivery of Drugs*

110.     On April 22, 2022, at approximately 9:04 a.m., SANTIAGO, using 774-503-9661[14], called ALCANTARA  (Session 918). ALCANTARA said that he had left drugs for SANTIAGO ("All set, I already left you that there.").  SANTIAGO then questioned if the courier had put the drugs inside ("But he put it inside, right?").  ALCANTARA responded, "I think so," to which SANTIAGO said, "No, no.  Call him and make sure so that it is not left outside." ALCANTARA then said, "Let me check, hold on."  Agents then heard ALCANTARA appear to place a call using another phone while simultaneously on the phone with SANTIAGO.  Agents heard ALCANTARA ask the other party, "Where did you put it?"  Agents could not hear what the other party said to ALCANTARA.  According to pen register records, at approximately 9:05 a.m., while speaking with SANTIAGO over Target Telephone 2, ALCANTARA made a voice call using WhatsApp on Target Telephone 3.  ALCANTARA then returned to his call with SANTIAGO and said, "In the truck, in the compartment, Cheo."  Based on my training and experience, and knowledge of the investigation, I believe that ALCANTARA's courier left the drugs for SANTIAGO in a Chevrolet Trailblazer (identified more fully below), which I know is a truck/SUV made by Chevrolet.

*June 8, 2022 – SANTIAGO Acquires Drugs from FNU LNU 1 at 113 Reynolds Street, New Bedford*

111.     On June 8, 2022, ALCANTARA delivered drugs to SANTIAGO that SANTIAGO ordered earlier that day.  That morning, at approximately 9:11 a.m., ALCANTARA

---

[14] Unless otherwise noted, SANTIAGO used this number for all communications to/from ALCANTARA described herein.

called SANTIAGO to see if he wanted drugs ("Are you ready today?"). (Session 1555) SANTIAGO affirmed ("Yes."). ALCANTARA then suggested he could drop off the drugs in the early-afternoon ("Well, all set, let me see if the stuff is ready early in the afternoon. What do you think?"). SANTIAGO responded that ALCANTARA should let him know when he was ready ("Yes, yes, hit me up when you are ready so I can be around here."). Later that day, at approximately 6:28 p.m., agents monitoring a pole camera in the area of 602 Eastern Avenue, Fall River, Massachusetts saw the Silver Jeep arrive onto Horton Street, adjacent to 602 Eastern Avenue. At 6:30 p.m., agents observed an unknown Hispanic male exit the front door of 602 Eastern Avenue, carrying a white plastic "Price Rite" bag and a green plastic bag. Within a few seconds, agents observed FNU LNU 1 exit the front door of 602 Eastern Avenue carrying a black bag. FNU LNU 1 then entered the front passenger seat of the Silver Jeep and a second unknown Hispanic male ("FNU LNU 2"), entered the rear passenger seat of the Silver Jeep.

112.     At approximately 6:49 p.m., agents conducting surveillance observed the Silver Jeep arrive in the driveway of 113 Reynolds Street, New Bedford. FNU LNU 1 exited the front passenger's seat of the Silver Jeep and walked up the driveway. Agents then saw FNU LNU 1 walking away from a blue Chevrolet Trailblazer, bearing Massachusetts registration 9LB872 (the "Chevrolet Trailblazer")[15] parked in the driveway of 113 Reynolds Street, while carrying a white bag in his hand and enter the front passenger seat of the Silver Jeep. Also at approximately 6:49 p.m., ALCANTARA called SANTIAGO and told him his courier was at SANTIAGO's house

---

[15] This car is registered in the name of Desaree Santiago, 113 Reynolds Street, Apartment #1, New Bedford, Massachusetts. Given the common last name, I believe that she is related to SANTIAGO.

("He is already outside, you heard?" ). (Session 1565).  SANTIAGO responded that he had received the drugs ("Oh yeah, everything is here.").  At 6:51 p.m., agents observed SANTIAGO exit the side door of 113 Reynolds Street and enter the front passenger seat of the Chevrolet Trailblazer.  At 6:52 p.m., agents observed SANTIAGO enter back into 113 Reynolds Street, again using the side door.

113.    At 6:55 p.m., ALCANTARA called SANTIAGO and SANTIAGO said that he still owed $2,000 ("There are 2,000 pesos missing there.").  (Session 1568).  ALCANTARA responded, "Okay."   SANTIAGO then asked when he could give ALCANTARA the money owed ("But um . . . to see if I can see you and hang out with you and give you that.").  ALCANTARA then responded, "Listen to that now, I am going to call you on Sunday, so you can come down here."

114.    At 7:24 p.m., agents observed on a pole camera in the vicinity of 66 Health Avenue, Providence, Rhode Island, FNU LNU 1 enter 66 Health Avenue while carrying what appeared to be the same black bag that he had carried from 602 Eastern Avenue earlier in the day before the Silver Jeep picked him up.  Based on my training and experience, and knowledge of the investigation, I believe that this black bag carried drug proceeds that FNU LNU 1 retrieved from SANTIAGO's Chevrolet Trailblazer that FNU LNU 1 provided to ALCANTARA at 66 Health Avenue.

115.    I believe that SANTIAGO continues to engage in the Target Offense with ALCANTARA.  Toll records for the ALCANTARA New Phone show this phone has had 17 calls/text messages with SANTIAGO between June 23, 2022 and June 28, 2022.

**ALCANTARA - FNU LNU 1**

116.    As described above, the investigation has showed that FNU LNU 1 is a courier

whom ALCANTARA routinely dispatches to deliver drugs after ALCANTARA receives an

order from a customer.  The investigation has further revealed as described below that FNU LNU

1 assists ALCANTARA in transporting and arranging drugs for distribution.

***April 12, 2022 – FNU LNU 1 Goes to 602 Eastern Avenue After ALCANTARA brings drugs to this location***

117.    On April 12, 2022, at 8:16 a.m., a pole camera near 66 Health Avenue,

Providence, Rhode Island, showed ALCANTARA and Rivera-Rodriguez exit the front door of

66 Health Avenue.  ALCANTARA was carrying a bag.  ALCANTARA approached the Ford

Edge, which was parked on the street, and placed the bag inside the rear passenger compartment.

Rivera-Rodriguez entered the driver's door of the Ford Edge and the car departed the area.

118.    About 30 minutes later, at 8:48 a.m., the pole camera showed ALCANTARA

walk to the front door of the residence and enter while carrying a bag.[16]  Around this same time,

the Ford Edge parked in front of the residence.  At 9:10 a.m., the pole camera showed FNU LNU

1 enter the residence through the front door.  At 9:12 a.m., ALCANTARA exited the residence

and entered the front passenger seat of the Ford Edge.  ALCANTARA appeared to not have

anything in his hands.  The Ford Edge then departed the area.  At 9:19 a.m., agents observed the

Ford Edge arrive at the Price Rite parking lot, located at 866 Pleasant Avenue, Fall River,

_____

[16] As described above, agents made these observations one day after (April 11, 2022), ALCANTARA told BARTHOLOMEW that he was going to New York.  Based on my training and experience, and knowledge of the investigation, I believe that ALCANTARA or an associate traveled to New York to obtain more drugs that were contained in the bag observed on April 12, 2022.

48

Massachusetts.  As described above, this same day and time, BARTHOLOMEW engaged in a drug deal in the Price Rite parking lot with the Silver Jeep.  Based on the evidence that FNU LNU 1 rides in the Silver Jeep to courier drugs for ALCANTARA, I believe he met with BARTHOLOMEW that day, but cannot be certain because agents were not able to see the interaction at the Silver Jeep.

***April 19, 2022 – FNU LNU 1 Packages Drugs at 602 Eastern Avenue***

119.    About seven days later, on April 19, 2022, I believe that FNU LNU 1 packaged drugs at 602 Eastern Avenue.  That evening, at approximately 10:05 p.m., agents observed an unknown male place a black bag into the right side of the dumpster located in the rear of 602 Eastern Avenue.  Agents observed FNU LNU 1 accompanying this unknown male at the time he dumped the black trash bag.  At approximately 10:10 p.m., agents retrieved three black garbage bags from the dumpster.  Inside one of the black garbage bags, agents retrieved four empty sandwich bag boxes and numerous cut sandwich bags, which, based on my training and experience, and knowledge of the investigation, show that 602 Eastern Avenue, Apartment # 1 is used by ALCANTARA to store and process drugs.  I know from my training and experience that drug dealers like ALCANTARA use plastic sandwich bags to package drugs.  In fact, during the controlled buys in this case, ALCANTARA provided fentanyl to CS-1 in plastic sandwich bags similar to the kind retrieved from the black garbage bag.

***June 1, 2022 – Drugs Transferred from 66 Health Avenue to 602 Eastern Avenue***

120.    On June 1, 2022, between 5 p.m. and 6 p.m., as described below, agents observed what I believe, based on my training and experience, and knowledge of this investigation, ALCANTARA, FNU LNU 1, another unknown male, FNU LNU 2 and Rivera-Rodriguez

transferring drugs from 66 Health Avenue, Providence, Rhode Island to 602 Eastern Avenue, New Bedford, Massachusetts .

121.    At approximately 5:04 p.m., a pole camera showed FNU LNU 1 enter 66 Health Avenue, carrying two green plastic bags and accompanied by a child (the "Child").  Within seconds, FNU LNU 1 exited 66 Health Avenue.  FNU LNU 1 did not have the two green plastic bags with him, but the Child was with him.  FNU LNU 1 and the Child then walked on Health Avenue in the direction of Academy Avenue.  At 5:10 p.m., a Mercedes SUV bearing Massachusetts registration 2FNW92 (the "Mercedes SUV"), and registered to Rivera-Rodriguez, arrived in front of 66 Health Avenue.  Rivera-Rodriguez exited the front driver's seat and FNU LNU 2 exited the front passenger seat.  FNU LNU 2 carried a white "Price Rite" shopping bag. FNU LNU 2 then placed the white Price Rite bag in the back seat of the Mercedes SUV.  In addition, the Child (who had been seen walking with FNU LNU1 earlier), exited the rear passenger seat compartment of the Mercedes SUV.[17]

122.    At 5:12 p.m., FNU LNU 1 arrived back at 602 Eastern Avenue.  FNU LNU 1 entered the residence.  At 5:16 p.m., the pole camera showed FNU LNU 1 and FNU LNU 2 exit the front door of 66 Health Avenue.   As depicted below, FNU LNU 1 was carrying four cereal boxes, two white plastic bags and one green plastic bag.  FNU LNU 2 carried a medium-sized brown box with a green bag on top of it.

---

[17] Although agents did not see it, based on this series of events, it appears that the Mercedes SUV had picked up the child at some point before arriving at 66 Health Avenue.



123.   At 5:18 p.m., as depicted below, FNU LNU 1, FNU LNU 2 and Rivera-Rodriguez loaded into the Mercedes SUV what appears to be all of the items that FNU LNU 1 and FNU LNU 2 had carried from the house:



124.    At approximately 5:20 p.m., ALCANTARA exited the front door of 66 Health

Avenue with the Child with him.  ALCANTARA got into the front passenger seat of the

Mercedes SUV.  Rivera-Rodriguez got into the driver's seat.  FNU LNU 1, FNU LNU 2 and the

Child got into the back seat and the Mercedes SUV departed the area.

125.    At 5:49 p.m., a pole camera showed the Mercedes SUV arrive at 602 Eastern

Avenue, Fall River, Massachusetts.  According to Google Maps, the distance between 66 Health

Avenue and 602 Eastern Avenue is 22.1 miles and a car ride takes approximately 29 minutes.

At 5:51 p.m., the pole camera showed ALCANTARA carrying multiple green plastic bags;

FNU LNU 1 carrying a medium-sized box with two cereal boxes on top of it; and FNU LNU 2

carrying a white Price Rite plastic bag and two cereal boxes.  All three men entered 602 Eastern Avenue while carrying these items.

126.     At 5:52 p.m., Rivera-Rodriguez exited the Mercedes with the Child and walked north on Eastern Avenue.  At 6:21 p.m., agents observed Rivera-Rodriguez return with the Child and get back into the Mercedes SUV.  Based on my training and experience and knowledge of the investigation, I believe that Rivera-Rodriguez remained in the car as a look-out for any police presence in the area.

127.     About two hours later, at 8:17 p.m., agents observed ALCANTARA exit 602 Eastern Avenue, while carrying a green bag, and return to the front passenger seat of the Mercedes SUV.  At 8:19 p.m., the Mercedes SUV departed the area, with ALCANTARA, Rivera-Rodriguez and the Child inside the vehicle.

128.     At 8:23 p.m., agents observed FNU LNU 2 exit 602 Eastern Avenue and walk to the S&K Convenience Store at 696 Eastern Avenue.  At 8:31 p.m., FNU LNU 2 returned to the residence.  At 8:40 p.m., FNU LNU 1 exited the front door of 602 Eastern Avenue while holding a light-colored garbage bag.  Agents observed FNU LNU 1 walk to the rear of the residence and open a dumpster lid.  Based on their vantage point, agents did not see FNU LNU 1 actually throw anything into the dumpster, but within minutes, agents saw FNU LNU 1 return to 602 Eastern Avenue while not carrying anything.

129.     Based on my training and experience, and knowledge of the investigation, I believe that during the above surveillance, ALCANTARA, FNU LNU 1 and FNU LNU 2 transported drugs from 66 Health Avenue to 602 Eastern Avenue.  I have been involved in numerous investigations where drugs are carried in what appear to be innocuous packaging like

the cereal boxes here.  Moreover, because of the illicit nature of drugs, in my training and experience, it is common for drug dealers to not carry drugs in open, but instead to carry them in otherwise innocent looking containers like cereal boxes.  Moreover, as the photos show, the cereal boxes were not being carried right-side up, which one would expect had they actually contained cereal.   It appears that FNU LNU 1 had to carry the boxes sideways with both hands on either sides of the boxes, which suggests that they in fact contained drugs (that I know in my training and experience are typically heavy).

**TARGET LOCATIONS**

***Description and Criminal Activity at Target Locations***

### (1) Stash House – Target Location # 1 - 602 Eastern Avenue, Apartment # 1

Description of Target Location

130.     602 Eastern Avenue, Apartment # 1, Fall River, Massachusetts is a three-family residential dwelling with beige/tan siding, with white trim.  The front door is white and the numbers "602" appear on the building immediately to the left of the front door.  The front door is located on Eastern Avenue.  There is also a metal mail box-located to the left of the front door, which appears to have three sections corresponding to the three apartments in the building.  There is a small set of stairs leading to the front door.  The first two stories of the dwelling have large bay windows.  Target Location # 1 is part of a duplex.  The other side of the building is identified as 594 Eastern Avenue, with three corresponding levels, as well.  A description and photograph of Target Location # 1 appear in Attachment A-1, which is attached hereto and incorporated herein by reference.

54

131.     As described above and below, this location is a stash house for the ALCANTARA DTO.  According to ALCANTARA's Massachusetts criminal record, Target Location # 1 is listed as his residence.  Utilities for Target Location # 1 are listed in the girlfriend of ALCANTARA, Rivera-Rodriguez.  Agents observed ALCANTARA in the bay window of the first floor on August 17, 2021.  On August 23, 2021, agents observed ALCANTARA standing in the doorway to Target Location # 1.  Around this time, agents observed Joseph ROBLES and Jordan LOPEZ, both of whom agents are familiar with from other investigations, carrying a large rectangular box from the rear of the Ford Edge into the front door of Target Location # 1.

132.     In addition, on April 1, 2022, when FNU LNU 1 was observed entering the common door to Target Location # 1, within a few moments, agents saw blinds on a window immediately to the left of the front door of the building on the first floor lift up briefly and then go down again as if someone was looking outside the window.  I believe based on my training and experience and knowledge of the investigation that these movements are consistent with Target Location # 1 being a stash location.  Moreover, I know based on my training and experience, that given that this location is currently being used as a stash house, it is likely that no one actually resides there currently.

Link to Criminal Activity

133.     As described above, on April 1, 2022, April 11, 2022, May 23, 2022, May 27, 2022, June 1, 2022, June 8, 2022 and June 17, 2022, agents saw FNU LNU 1 visit Target Location # 1 immediately before delivering drugs to ALCANTARA's customers.  In addition, as also described above, on April 12, 2022 and June 1, 2022, agents observed drugs being

transported to Target Location # 1.  In addition, I believe that the ALCANTARA DTO uses

Target Location # 1 to process drugs given the sandwich baggies retrieved from the dumpster

behind this location on April 19, 2022.  Accordingly, I believe that evidence of

ALCANTARA's ongoing drug trafficking activities, including drug paraphernalia (such as

weights, scales, cutting agents, baggies, packaging), records/ledgers detailing drug transactions

and drug debts, customer lists and drug proceeds, as set forth in Attachment B, will be found at

Target Location # 1.

### (2) **COLLAZO's Residence – Target Location # 2**

Description of Target Location

134.    163 Chestnut Street, New Bedford, Massachusetts is a single-family residential

building with yellow siding and white trim.  The house has two stories, with three windows on

the first floor and two on the second floor.  There is a wood-colored staircase leading to the

front door of the residence, which is on Chestnut Street.  The front door does not directly face

Chestnut Street, but is off of a portion of the house that sticks out on the right-side of the

building.  The front door faces the driveway.  A description and photograph of Target Location

# 2 appear in Attachment A-2, which is attached hereto and incorporated herein by reference.

135.    I believe that COLLAZO resides here for several reasons.  First, New Bedford

Police Department records list Target Location # 2 as the residence of COLLAZO.  In addition,

surveillance has showed him at this residence.  On May 26, 2022, agents observed COLLAZO

and FNU LNU 1 meet at Target Location # 2.   On June 16, 2022, agents observed COLLAZO

exit this residence and walk his dog.  COLLAZO briefly returned to the residence, and then

exited again with a female party.  COLLAZO got into the driver's seat of a Silver Chevrolet

Cruze, bearing Massachusetts registration 3FBC39, registered to COLLAZO (the "Chevrolet Cruze") that was parked in the driveway of the residence. The female party got into the passenger side and the car departed the area. On June 30, 2022, surveillance again showed COLLAZO's Chevrolet Cruze parked in the driveway of Target Location # 2. Since June 30, 2022, agents have received location information for COLLAZO's 774-534-8812, which has shown the location of this phone consistently in the vicinity of Target Location # 2 in both the daytime and evening hours.

Link to Criminal Activity

136.   As described above, on numerous occasions during the investigation, COLLAZO has received drugs at Target Location # 2. ALCANTARA sent drugs to this location on March 31, 2022 and May 23, 2022 after COLLAZO had ordered over the phone. In addition, as also described above, COLLAZO confirmed that he receives drugs at his home when he told ALCANTARA on June 14, 2022 that he did not want "Jordan" (who appears to work for ALCANTARA) at COLLAZO's "house." These statements further demonstrate, based on my training and experience, that COLLAZO distributes drugs out of his home. Moreover, I believe based on my training and experience, and knowledge of the investigation, that COLLAZO re-distributes the drugs that he obtains from ALCANTARA. The quantities of tens of grams at a time that COLLAZO orders are indicative of a retail dealer of drugs. I also know based on my training and experience, that dealers like COLLAZO who have been involved in drug dealing over an extended period of time will keep evidence of their illegal activities for a long period of time, like ledgers, customer lists and drug paraphernalia. Drug dealers do not like to destroy or discard these items because of their value to their drug business and therefore, based on my

training and experience, I have reason to believe that these items will be located at Target

Location # 2.[18]  In addition, there is probable cause to believe that COLLAZO's phone assigned

774-534-8812, used in the commission of the Target Offense, will be located at Target Location

# 2 because it is COLLAZO's residence.[19]  Accordingly, I believe that evidence of

COLLAZO's ongoing drug trafficking activities, including drug paraphernalia (such as weights,

scales, cutting agents, baggies, packaging), records/ledgers detailing drug transactions and drug

debts, customer lists and drug proceeds, as set forth in Attachment B, will be found at Target

Location # 2.

### (3) CRUZ's Residence – Target Location # 3

Description of Target Location

137.    56 Washburn Street, Apartment # 1 and detached trailer, New Bedford,

Massachusetts is a three-family residence with beige/tan siding.  The trim of the house is white

and beige.  The front door is located on Washburn Street.  The number "56" appears in black

above the front door, which is also a beige/tan color.  There are two black mailboxes to the left

of the front door and one black mailbox to the right of the front door.  There is a black metal fire

escape between the second and third stories of the residence.  In addition, the trailer is located at

---

[18] Furthermore, for all of the Target Locations that I seek to search, as described herein, I believe they have been used over an extended period of time to support and run drug businesses.  Accordingly, I have reason to believe that drug paraphernalia and other items related to running such drug businesses will be located at the Target Locations.

[19] I know based on my training and experience, and life experience, that individuals commonly keep their cellular telephones in their residences.

the end of the driveway to the residence, which is located to the left-side of the building.  A description and photograph of Target Location # 3 appear in Attachment A-3, which is attached hereto and incorporated herein by reference.

138.    I believe that CRUZ resides at Target Location # 3 for several reasons.  First, Registry of Motor Vehicle records list this location as his residence. Second, as described above, agents saw CRUZ at Target Location # 3 on June 1, 2022 and June 21, 2022.  In fact, CRUZ has lived at Target Location # 3 for several years.  For example, on July 3, 2019, New Bedford Police responded to the Target Location # 3 for a report by CRUZ that he had been the victim of a breaking and entering.  Furthermore, on December 7, 2018 and May 26, 2020, New Bedford Police responded to this residence and encountered CRUZ upon reports of domestic incidents between him and his girlfriend.  Since June 30, 2022, agents have received location information for CRUZ's 774-992-3953, which has shown the location of this phone consistently in the vicinity of Target Location # 3 in both the daytime and evening hours.

Link to Criminal Activity

139.    As described above, on April 1, 2022 and June 1, 2022, surveillance showed FNU LNU 1 drop drugs off at Target Location # 3 after CRUZ had ordered the drugs by telephone with ALCANTARA.  Specific to the June 1 deal, agents observed CRUZ return to the residence and enter the back door, after FNU LNU 1 had dropped off the drugs.  In addition, on June 5, 2022, CRUZ and ALCANTARA spoke about a missed deal where it appears CRUZ had left money for ALCANTARA, but then removed the money from the drop location after not being able to make contact with ALCANTARA.   On June 21, 2022, a pole camera showed FNU LNU drop off drugs to the trailer; FNU LNU 1 exit the trailer shortly after entering it; CRUZ enter the

59

trailer briefly; and then go behind the residence as if it to go inside.  In addition, there is probable cause to believe that CRUZ's phone assigned 774-992-3953, used in the commission of the Target Offense, will be located at Target Location # 3 because it is CRUZ's residence. Moreover, I believe based on my training and experience, and knowledge of the investigation, that CRUZ re-distributes the drugs that he obtains from ALCANTARA.  The quantities of hundreds of grams at a time that CRUZ orders are indicative of a retail dealer of drugs. Accordingly, I believe that evidence of CRUZ's ongoing drug trafficking activities, including drug paraphernalia (such as weights, scales, cutting agents, baggies, packaging), records/ledgers detailing drug transactions and drug debts, customer lists and drug proceeds, as set forth in Attachment B, will be found at Target Location # 3, including in the trailer located in the driveway.

### (4) **PACHECO's Residence – Target Location # 4**

Description of Target Location

140.    3 Granite Street, Apartment  # 1, Taunton, Massachusetts, is a two-family residential building.  The residence has yellow siding and windows encased in white trim.  There is a front porch and the front door is yellow with a white storm-door, as well.  There are four concrete steps leading to the porch.  The porch is anchored by four columns facing the street. There is a paved driveway to the left of the residence.  A description and photograph of Target Location # 4 appear in Attachment A-4, which is attached hereto and incorporated herein by reference.

141.    I believe that PACHECO resides at Target Location # 4 based on surveillance described above and Taunton Police Reports showing that he has resided at this location for a

long period of time.  For example, on January 3, 2018, at 10:55 a.m., Taunton Police observed a

Nissan Maxima bearing Massachusetts registration 24HY39 (the "Nissan Maxima"), parked on

the street in front of Target Location # 4.  Around this same time, police observed a person exit

Target Location # 4, enter the Nissan Maxima and the vehicle drove away.  Police stopped the

car and asked the driver of the Nissan Maxima "what happens" at 3 Granite Street.  The driver,

whose name I am omitting to protect his/her privacy, told the officer that "Mike sells dope" and

that "Mike" is a "bad guy"  who sells heroin.  The driver claimed to have not bought any heroin

from "Mike," but the officer noted in the report seeing several empty baggies with a white

powder residue on them, consistent with illegal drug use, visible in the Nissan Maxima.  Based

on the report referencing a "Mike" and my belief that *Michael* PACHECO deals fentanyl, I

believe "Mike" refers to PACHECO.

142.    In addition, according to another Taunton Police Report, on June 8, 2017, police

responded to 13 Granite Street, Apartment # 1, Taunton, Massachusetts for a reported overdose.

Police encountered a resident of 13 Granite Street, Apartment # 1, who said that PACHECO had

provided heroin to the person who had just overdosed.  The resident further stated that

PACHECO had also supplied heroin to another person who overdosed and died.  The police

report does not elaborate on how this resident knew that PACHECO was the dealer.  However,

the police report did further specify that the mailbox outside the residence for the first-floor

apartment had PACHECO's name listed on it.  Also on this same day, police observed what they

believed to be a hand-to-hand transaction within Target Location # 4.  Police observed

PACHECO exit the side door of the building housing Target Location # 4, bring the customer

inside the building, and then the customer quickly left.  Police stopped the customer who
admitted to buying two Xanax pills from PACHECO.

143.     Since June 30, 2022, agents have received location information for PACHECO's
508-245-1958, which has shown the location of this phone consistently in the vicinity of Target
Location # 4 in both the daytime and evening hours.

<u>Link to Criminal Activity</u>

144.     As described above, there is probable cause to believe that PACHECO has been a
drug dealer for a long time.  Intercepted calls showed him setting up drug deals with
ALCANTARA on April 7, 2022 and April 16, 2022.  Moreover, on April 26, 2022, June 10,
2022 and June 23, 2022, ALCANTARA and PACHECO further spoke related to their drug
dealing activities.  There is also probable cause to believe that Target Location # 4 will contain
evidence related to the Target Offense.  On May 23, 2022, PACHECO received drugs at Target
Location # 4.  In addition, there is probable cause to believe that PACHECO's phone assigned
508-245-1958, used in the commission of the Target Offense, will be located at Target Location
# 4 because it is PACHECO's residence.

145.     The information above from police reports in 2017 and 2018 show that
PACHECO has been dealing drugs from Target Location # 4 for an extended period of time, and
therefore, evidence related to the Target Offense will be found at Target Location # 4.  The
quantities of drugs, specifically 70 to 100 grams, that PACHECO has ordered from
ALCANTARA as part of this investigation are, based on my training and experience, consistent
with dealing drugs to customers and not using the drugs personally.  Accordingly, I believe that
evidence of PACHECO's ongoing drug trafficking activities, including drug paraphernalia (such

as weights, scales, cutting agents, baggies, packaging), records/ledgers detailing drug

transactions and drug debts, customer lists and drug proceeds, as set forth in Attachment B, will

be found at Target Location # 4.

**(5) SANTIAGO's Residence – Target Location # 5**

146.    113 Reynolds Street, Apartment # 1, New Bedford, Massachusetts is a three-unit

residential building.  The building is blue with white trim and black shutters.  The front door to

the building is cream-colored and is located on the right side of the building.  The building is

three stories and it appears that there is one apartment on each floor of the building.  A

description and photograph of Target Location # 5 appear in Attachment A-5, which is attached

hereto and incorporated herein by reference.

147.    I believe that SANTIAGO resides at Target Location #5 based on his criminal

record that lists this address.  In addition, phone records show that the phone that SANTIAGO

used during intercepted calls with ALCANTARA, 774-503-9661, is subscribed to SANTIAGO

at Target Location #5.  Since June 30, 2022, agents have received location information for this

phone number, which has shown the location of this phone consistently in the vicinity of Target

Location # 5 in both the daytime and evening hours.

148.    In addition, agents conducting surveillance on June 30, 2022, observed the

Chevrolet Trailblazer, which, as described above, SANTIAGO uses to receive drugs from

ALCANTARA, parked on the street near Target Location #5.  In addition, as described above,

on June 8, 2022, SANTIAGO was observed coming out of the building for Target Location #5,

retrieving drugs from the Chevrolet Trailblazer, and then returning inside the building.

149.     I have also reviewed New Bedford Police reports related to SANTIAGO for 2018, 2016, 2011 and 2008, and in all of these reports, SANTIAGO's residence is listed as Target Location # 5.

Link to Criminal Activity

150.     As described above, on both April 22, 2022 and June 8, 2022, SANTIAGO conducted drug deals with ALCANTARA.  Most recently, on June 8, 2022, agents saw SANTIAGO retrieve the drugs from the Chevrolet Trailblazer and return immediately to the building of Target Location #5.  Similarly, in the drug deal on April 22, ALCANTARA advised SANTIAGO that he had dropped the drugs on this occasion in the "truck," which I interpret to mean the Chevrolet Trailblazer.  In addition, there is probable cause to believe that SANTIAGO's phone assigned 774-503-9661 will be located at Target Location # 5 because it is SANTIAGO's residence.  Moreover, although SANTIAGO and ALCANTARA did not speak about specific quantities of drugs in the intercepted calls with SANTIAGO, given the evidence that ALCANTARA's other customers, like BARTHOLOMEW, COLLAZO, CRUZ and PACHECO order quantities that they re-distribute, there is probable cause to believe that SANTIAGO, too, orders significant quantities of drugs from ALCANTARA that he then re-distributes to others.

151.     There is other evidence that SANTIAGO is a drug trafficker.  SANTIAGO has an open case in New Bedford District Court for distribution/dispense Class A controlled substances and an open case in Bristol Superior Court for trafficking 100+ grams of heroin and possession to distribute class D (marijuana). SANTIAGO also has prior convictions including conspiracy to violate the controlled substances act (2011), and distribute/dispense class A, and possession of

class D controlled substance (2008).  Among the New Bedford police reports that I reviewed in this case, one report details a search warrant at Target Location # 5 on January 30, 2016 in which SANTIAGO was the target.  According to the report, officers seized from Target Location # 5 numerous items related to drug trafficking, including 198 grams of "suspected heroin," a large steel "finger" press, narcotics packaging, a digital scale and approximately $7,939 in cash. Therefore, there is probable cause that SANTIAGO is a long-time drug trafficker, who will keep evidence related to the Target Offense at his residence.  Accordingly, I believe that evidence of SANTIAGO's ongoing drug trafficking activities, including drug paraphernalia (such as weights, scales, cutting agents, baggies, packaging), records/ledgers detailing drug transactions and drug debts, customer lists and drug proceeds, as set forth in Attachment B, will be found at Target Location # 5.

DRUG TRAFFICKERS' AND MONEY LAUNDERERS' USE OF RESIDENCES AND CELLULAR TELEPHONES

152.    Based on my training and experience, and the collective experience of other agents participating in this investigation, I know that traffickers of controlled substances frequently maintain, at their residences or stash locations, quantities of illicit drugs to maintain their ongoing drug business. I also know that traffickers of controlled substances usually keep, in addition to drugs, paraphernalia for the packaging, diluting, cutting, weighing, processing, and distributing of controlled substances, including scales, plastic bags, cutting agents, and utensils, at their residences or stash locations. Based upon my training and experience, as well as the training and experience of other law enforcement agents I have worked with, I am aware that it is generally a common practice for drug traffickers to store drug-related paraphernalia in their residences or stash locations for longer periods of time than they keep drugs there.

65

153.    I also know from my training and experience that drug traffickers have an interconnected and symbiotic relationship with money launderers. Drug suppliers operating outside of the United States rely on illicit money brokers and money launderers to launder and repatriate their drug proceeds. The money launderers need to keep detailed records of their financial transactions to show proof of the laundering. After the money is deposited into accounts, many of the financial transactions made in furtherance of laundering are conducted electronically either using phones or computers. It is common for money launderers to keep detailed records of their financial transactions, including the account numbers to which they send laundered proceeds. I know that many of these records are stored in electronic devices, such as phones and computers. Moreover, it is common for money launderers to collect large sums of drug proceeds and store them before laundering to reduce the number of times they are required to make trips to deposit the sums into the banking or financial systems.

154.    Based upon my experience and the experience of other law enforcement officers who have participated in the execution of numerous search warrants at the residences of drug-traffickers, it is generally a common practice for drug traffickers and money launderers to maintain in their residences records relating to their drug trafficking activities. Because drug traffickers in many instances will "front" (that is, sell on consignment) controlled substances to their clients, or alternatively, will be "fronted" controlled substances from their suppliers, record-keeping is necessary to keep track of amounts paid and owed, and such records are often kept close at hand so that current balances can be verified and recorded.  Often drug traffickers keep "pay and owe" records to show balances due for drugs sold in the past ("pay") and for payments expected ("owe") as to the trafficker's suppliers and the trafficker's dealers. Additionally, drug

traffickers often maintain telephone and address listings of clients and suppliers and keep them immediately available in order to efficiently conduct their drug trafficking business. I am also aware that drug traffickers often maintain such documents related to their drug trafficking activities at their residences for an extended period of time, regardless of whether they are physically in possession of drugs on the premises.

155.    Likewise, money launderers keep detailed records of their financial transactions to evidence them. Because money launderers provide repeated services to some DTOs, it is necessary for them to maintain these records for extended periods to avoid unnecessary and duplicative exchanges of banking account information. This information is normally stored in the electronic devices that money launderers use to conduct financial transactions, such as cell phones and computers.

156.    Even when drug dealers store their drugs outside their residence, I know that they often will keep records relating to these offsite storage locations at their primary residence.  Such documents include rental or storage property agreements and receipts.

157.    Based upon my training and experience, as well as the training and experience of other law enforcement agents I have worked with, I am also aware that it is generally a common practice for traffickers to conceal at their residences either the proceeds from drug sales or monies to be used to purchase controlled substances. Drug traffickers and money launderers typically make use of wire transfers, cashier's checks, and money orders to pay for controlled substances, and evidence of such financial transactions and records relating to income and expenditures of money and wealth in connection with drug trafficking and money laundering are

often kept in their residences. Moreover, the cash proceeds of drug trafficking and money laundering often contain traces of the narcotics sold or bought by the drug dealers.

158.    Moreover, drug traffickers and money launderers commonly possess and use multiple cellular telephones simultaneously to conduct their drug trafficking/money laundering activities, and many of these cellular telephones are kept at their residences. It is common for these cellular telephones to be retained, although not necessarily used, for months or longer by drug traffickers in their vehicles, residences, and businesses. Drug traffickers often do not discard their cellular telephones immediately after they stop actively using them. Therefore, while it is common for drug traffickers to stop using cellular telephones frequently, it is far less common for drug traffickers to discard their cellular telephones after they switch to new cellular telephones. As a result, I am aware that collections of cell phones have been found during drug trafficking search warrants that have included cell phones that were no longer being used by a particular drug trafficker but had nevertheless been retained.

159.    When drug traffickers amass proceeds from the sale of drugs, they often attempt to launder/legitimize these profits, or otherwise conceal them from discovery by law enforcement.  In an effort to accomplish these goals, drug traffickers often place assets, such as vehicles and residences, in the names of other persons to conceal their true ownership and the manner in which they were acquired. Records reflecting the implementation of such deceptive practices, such as deeds, titles, and service records, are likely to be found inside the residence of the drug trafficker.

160.    Finally, as noted above, evidence of drug and money laundering crimes can be found in the cell phones, smart phones, and computers referenced in the preceding paragraphs.

Such evidence can include internet searches for drug-related paraphernalia, addresses, or telephone numbers, as well as incriminating communications via emails, text messages or instant messages.  From my training, experience, and information provided to me by other agents, I am aware that individuals commonly store records of the type described in Attachment B on their cellular telephones and computers.

161.     It should be noted that, with the advance of technology, the distinction between computers and cellular telephones is quickly becoming less clear. Actions such as internet searching or emailing, in addition to calling and text messaging, can now be performed from many cell phones.  In addition, those involved in drug trafficking crimes commonly communicate using multiple cellular telephones. Contemporaneous possession of multiple cellular telephones is, therefore, evidence of drug trafficking. Moreover, the particular numbers of and the particular numbers dialed by particular cellular telephones can be evidence of drug trafficking, particularly in a case involving the interception of communications between drug traffickers. Such numbers can confirm identities of particular speakers and the occurrence of certain events.

162.     As with most electronic/digital technology items, communications made from an electronic device, such as a computer or a cell phone, are often saved or stored on the device. Storing this information can be intentional, for example, by saving an e-mail as a file on a computer or saving the location of one's favorite websites in "bookmarked" files. Digital information can also be retained unintentionally.  Traces of the path of an electronic communication or of an internet search may be automatically stored in many places on a computer or a cell phone. In addition to electronic communications, a user's Internet activities

generally leave traces in the web cache and Internet history files. A forensic examiner often can recover evidence that shows when and in what manner a user of an electronic device, such as a computer or a cell phone, used such a device.

163.    Electronic files or remnants of such files can be recovered months or even years after they have been downloaded, deleted, or viewed via the Internet.  Electronic files downloaded to a hard drive can be stored for years at little or no cost. Even when such files have been deleted, they often can be recovered months or years later using readily available forensic tools. When a person "deletes" a file on an electronic storage device such as a computer, the data contained in the file often does not actually disappear; rather, that data often remains on the device until it is overwritten by new data. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space -- that is, in space on a device that is not allocated to an active file or that is unused after a file has been allocated to a set block of storage space -- for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.  Similarly, files that have been viewed via the Internet are automatically downloaded into a temporary Internet directory or "cache."  The browser typically maintains a fixed amount of hard drive space devoted to these files, and the files are only overwritten as they are replaced with more recently viewed Internet pages. Thus, the ability to retrieve residue of an electronic file from an electronic storage device depends less on when the file was sent, downloaded, or viewed than on a particular user's operating system, storage capacity, and habits.

164.    The Target Locations to be searched may contain computer equipment whose use in the Target Offense or storage of the things described in this warrant is impractical to

determine at the scene. Computer equipment and data can be disguised, mislabeled, or used without the owner's knowledge.  In addition, technical, time, safety, or other constraints can prevent definitive determination of their ownership at the premises during the execution of this warrant.  If the things described in Attachment B are of the type that might be found on any of the computer equipment, this application seeks permission to search and seize it onsite or off-site in order to determine their true use or contents, regardless of how the contents or ownership appear or are described by people at the scene of the search.

165.     The law enforcement agents will endeavor to search and seize only the computer equipment which, upon reasonable inspection and/or investigation conducted during the execution of the search, reasonably appear to contain the evidence in Attachment B because they are associated with (that is used by or belong to) one of the Target Subjects. If however, the law enforcement agents cannot make a determination as to use or ownership regarding any particular device, the law enforcement agents will seize and search that device pursuant to the probable cause established herein.

166.     Generally speaking, imaging is the taking of a complete electronic picture of the data, including all hidden sectors and deleted files.  Imaging permits the agents to obtain an exact copy of the computer's stored data without actually seizing the computer equipment. However, imaging at the premises can often be impractical, because imaging is resource-intensive:  it can take hours or days, thus requiring law enforcement agents to remain at the premises for much longer than they would remain if they seized the items, and it can require personnel with specialized experience and specialized equipment, both of which might be unavailable. If law

enforcement personnel do create an image at the premises, they will then search for the records and data specified in the warrant from the image copy at a later date off site.

167.    This warrant authorizes a review of electronic storage media seized, electronically stored information, communications, other records and information seized, copied or disclosed pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the DEA may deliver a complete copy of the seized, copied, or disclosed electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

UNLOCKING A DEVICE USING BIOMETRIC FEATURES

168.    I know from my training and experience, as well as from information found in publicly available materials, that some models of cellphones made by Apple and other manufacturers, offer their users the ability to unlock a device via the use of a fingerprint or through facial recognition, in lieu of a numeric or alphanumeric passcode or password.

169.    On the Apple devices that have this feature, the fingerprint unlocking feature is called Touch ID. If a user enables Touch ID on a given Apple device, he or she can register up to 5 fingerprints that can be used to unlock that device. The user can then use any of the registered fingerprints to unlock the device by pressing the relevant finger(s) to the device's Touch ID sensor.  In some circumstances, a fingerprint cannot be used to unlock a device that has Touch ID enabled, and a passcode must be used instead, such as: (1) when more than 48 hours has

passed since the last time the device was unlocked and (2) when the device has not been unlocked via Touch ID in 8 hours and the passcode or password has not been entered in the last 6 days.  Thus, in the event law enforcement encounters a locked Apple device, the opportunity to unlock the device via Touch ID exists only for a short time. Touch ID also will not work to unlock the device if (1) the device has been turned off or restarted; (2) the device has received a remote lock command; or (3) five unsuccessful attempts to unlock the device via Touch ID are made.

170.    The passcode that would unlock the Subject Device/Apple device(s) found during the search of the Target Locations is not currently known to law enforcement. However, during the course of this investigation, a number of the Target Subjects have used Apple iPhones to conduct their drug and money laundering business. Thus, it may be useful to press the finger(s) of the user(s) of the Subject Device/Apple device(s) found during the search of the Target Locations to the device's fingerprint sensor or to hold the device up to the face of the owner in an attempt to unlock the device for the purpose of executing the search authorized by this warrant. The government may not otherwise be able to access the data contained on those devices for the purpose of executing the search authorized by this warrant.

171.    In my training and experience, the person who is in possession of a device or has the device among his or her belongings at the time the device is found is likely a user of the device.  However, in my training and experience, that person may not be the only user of the device whose fingerprints are among those that will unlock the device and it is also possible that the person in whose possession the device is found is not actually a user of that device at all. Furthermore, in my training and experience, I know that in some cases it may not be possible to

know with certainty who is the user of a given device, such as if the device is found in a common area of a premises without any identifying information on the exterior of the device. Thus, it may be necessary for law enforcement to have the ability to require any occupant of the Target Locations to press their finger(s) against the sensor of the locked device(s) or place the devices in front of their faces in order to attempt to identify the device's user(s) and unlock the device(s).

172.    For these reasons, I request that the Court authorize law enforcement to press the fingers (including thumbs) of the Target Subjects or co-conspirators identified in this affidavit to the sensor of the devices or place the devices in front of their faces for the purpose of attempting to unlock the device in order to search the contents as authorized by this warrant.

173.    I have participated in the execution of numerous search warrants at the residences of drug traffickers similar to the targets of this investigation. In a substantial number of residential searches executed in connection with the drug investigations in which I have been involved, the following types of drug-related and/or money laundering evidence typically have been recovered in both conventional and electronic formats:

a. controlled substances;

b. paraphernalia for packaging, processing, diluting, weighing, and distributing controlled substances, such as scales, funnels, sifters, grinders, glass panes and mirrors, razor blades, plastic bags, microwave ovens, heat-sealing devices, and diluents such as mannitol, mannite, and inositol;

c. books, records, receipts, notes, ledgers, letters, and other papers relating to the distribution of controlled substances, travel for the purpose of acquiring and/or

distributing controlled substances, and to monetary transactions involving the proceeds from the sale of controlled substances;

d.   personal books, papers, and other electronic devices reflecting names, addresses, telephone numbers, and other contact or identification data relating to the distribution of controlled substances, money laundering, and the criminal use of communication facilities;

e.   cash, currency, and records relating to the generation of income from the sale of controlled substances and the expenditure of such income, including money orders, wire transfers, cashier's checks and receipts, bank statements, passbooks, checkbooks, and check registers, as well as consumer items such as electronic equipment, vehicles, jewelry, and precious metals such as gold and silver, and precious gems such as diamonds - it should be noted that possession of the valuable items referenced in this paragraph, particularly by individuals with no substantial legitimate source of income, is evidence of drug trafficking as opposed to drug use;

f.   documents and other records indicating travel in interstate and foreign commerce, such as maps, GPS coordinates, navigation coordinates, travel itineraries, plane tickets, boarding passes, motel and hotel receipts, passports and visas, credit card receipts, and telephone bills and related communications;

g.   cellular telephones, smart phones, electronic tablet devices, and other electronic media utilized for communication, transportation, and data acquisition and

75

retention purposes related to acquiring and distributing illegal drugs and proceeds, including incoming and outgoing call and text message logs, contact lists, photo and video galleries, sent and received text messages, online searches and sites viewed via the internet, online or electronic communications sent and received (including email, chat, and instant messages), sent and received audio files, navigation, mapping, and GPS files, telephone settings (including contact lists) text messages, and related identifying information such as telephone identification numbers, call forwarding information, messages drafted but not sent, and voice messages;

h.   firearms and other dangerous weapons; and

i.   identification evidence and/or indicia, such as cell phones with particular numbers, mail, deeds, leases, rental agreements, photographs, bills, and identification documents, that tend to identify the person(s) in residence, occupancy, control, or ownership of subject premises and/or subject communication devices.

174.   Based on all of the information I have obtained during the course of this investigation, and for the reasons more specifically set forth herein, I believe that the Target Subjects are engaged in drug trafficking and/or money laundering. I believe that evidence of their drug trafficking and/or money laundering offenses will be found inside each of the Target Locations and on certain cellular telephones, computers, or electronic equipment seized therefrom.

## **CONCLUSION**

175.    Based on the information set forth above, I believe probable cause exists to conclude that the Target Subjects have conspired to possess with intent to distribute and to distributefpara controlled substances, in violation of 21 U.S.C. §846, and that evidence of said criminal offenses, as set forth herein and in Attachments B of each of the respective search warrant applications for the Target Locations, will be found inside each Target Location.

176.    I, Kevin Barbosa, having signed this Affidavit under oath as to all assertions and allegations contained herein, state that its contents are true and correct to the best of my knowledge, information, and belief.



_____
KEVIN BARBOSA
TASK FORCE OFFICER
DRUG ENFORCEMENT ADMINISTRATION


Sworn before me by telephone in accordance with the requirements of Federal Rule of Criminal Procedure 4.1 this  8th  day of July, 2022.


_____
HONORABLE MARIANNE B. BOWLER
UNITED STATES MAGISTRATE JUDGE
DISTRICT OF MASSACHUSETTS